**Jimmy S. ELSTNER, Plaintiff,**

v.

**SOUTHWESTERN BELL TELEPHONE COMPANY, Communications Workers of America, and CWA Local 12222, Defendants.**

Civ. A. No. H–85–119.

United States District Court,
S.D. Texas,
Houston Division.

April 29, 1987.

David T. Lopez, David T. Lopez & Associates, Houston, Tex., for plaintiff.

Bruce Fickman, David Van O'S, Schwartz, Waterman, Fickman & Van O'S, Houston, Tex., for C.W.A. and C.W.A. Local 12222.

Robert W. Rickard, Law Office of David Duke & Associates, P.C., Houston, Tex., for C.W.A.

Richard D. Billeaud, Houston, Tex., for Southwestern Bell.

## FINDINGS OF FACT/CONCLUSIONS OF LAW

SINGLETON, Chief Judge.

This is an action arising under the Labor Management Relations Act of 1947, § 301, 29 U.S.C. § 185(a), and the Texas Human Rights Act. The plaintiff, Jimmy S. Elstner, an employee of defendant Southwestern Bell Telephone Company (hereinafter "Southwestern Bell"), alleges that a transfer within his employment, that resulted in a diminution in pay, was occasioned solely by discrimination against him because of a physical handicap in violation of the Texas Human Rights Act, the Collective Bargaining Agreement between Southwestern Bell and the Communication Workers of America (hereinafter "C.W.A."), and Southwestern Bell's Affirmative Action Program. With respect to the Defendant Labor Organizations, plaintiff sues for breach of the duty of fair representation. Plaintiff seeks declaratory and injunctive relief, compensatory and punitive damages and costs of this action, including attorney's fees.

This Court conducted the bench trial in this action during October 20–22, 1986. After hearing the evidence and counsels' arguments, this Court ordered the parties to submit Proposed Post-Trial Findings of Fact/Conclusions of Law and Memoranda of Authorities. Having now reviewed the evidence and post-trial documents this Court makes the following Findings and Conclusions pursuant to Fed.R.Civ.P. 52(a).

### FINDINGS OF FACT

1. Jimmy S. Elstner, the Plaintiff, is an adult white male citizen of the United States and of the State of Texas, residing in Houston, Harris County, Texas.

2. At all times relevant to this complaint and at the present time the Plaintiff was and is an employee of Southwestern Bell Telephone Company.

3. Defendant Communications Workers of America is a national labor organization with its headquarters in Washington, D.C.

4. Defendant CWA Local 6222 (formerly 12222) is a labor organization affiliated

with the Communication Workers of America and maintains its office in Houston, Texas.

5. Defendant Southwestern Bell Telephone Company is a communications common carrier incorporated under the laws of the State of Missouri with corporate headquarters in St. Louis, Missouri, and doing business in the states of Texas, Missouri, Kansas, Arkansas and Oklahoma.

6. Plaintiff became an employee of Defendant Southwestern Bell Telephone Company on or about September 29, 1969.

7. At the time plaintiff was employed and at all times to the present, Defendant Southwestern Bell has been a party to a Collective Bargaining Agreement with Defendant Communications Workers of America.

8. At all times since his employment, plaintiff has been a member of a certified collective bargaining unit represented by Defendants CWA and its Local 6222 (formerly 12222).

9. In 1973, plaintiff was assigned to the installation of telephone communication lines, in a position then known as Station Installer and later renamed Service Technician.

10. Some of the general duties of a service technician, as set forth in Southwestern Bell's job description, require that a person in that position be able to climb telephone poles.

11. It is generally company policy that service technicians at Southwestern Bell maintain the ability to climb poles.

12. There are, however, some areas in South Texas where service technicians are rarely, if ever, called upon to climb telephone poles because the telephone wires are underground.

13. Plaintiff worked as a service technician until September 1984, when he was reassigned to the position of Maintenance Administrator, an inside position which necessarily required no pole climbing. This reassignment, which resulted in plaintiff taking a significant decrease in pay, was ultimately predicated by plaintiff's no longer being physically able to climb telephone poles.

14. Plaintiff's problems began in 1973 when he originally injured his knee in a softball game. After a short period of restricted activity, plaintiff was able to return to his normal duties, including climbing poles.

15. In 1975, plaintiff reinjured his knee. Plaintiff testified that this injury occurred on the job. As a result of this second injury, in 1976 plaintiff was forced to undergo knee surgery.

16. After the surgery, plaintiff testified that he was able to resume his normal duties, including the climbing of telephone poles. During the period following his surgery, plaintiff was using either hooks or a ladder to climb the poles. Plaintiff testified that he continued this practice until 1982 when a Southwestern Bell supervisor, Mr. Walkoviak, issued a memorandum directing service technicians to use hooks and not a ladder when climbing poles.

17. Plaintiff objected to this company directive and a grievance concerning the matter was apparently filed. Plaintiff, however, was never informed of the result of that grievance.

18. In 1982, plaintiff submitted a request for a hardship transfer. In support of that request plaintiff submitted a letter from his personal physician. The letter indicated that the physician had found plaintiff's knee to be unstable and he advised that plaintiff be relieved of pole climbing duties. Southwestern Bell sought the opinions of two company medical advisors who agreed with the assessment of plaintiff's physician and advised plaintiff not to continue climbing poles.

19. At the time he was seeking a hardship transfer, plaintiff received a performance appraisal. It is the policy at Southwestern Bell that a transfer request will not be considered unless the employee making the request has received a composite performance rating of satisfactory on his most recent performance appraisal. Initially plaintiff received a composite rating of satisfactory. This rating was later changed to unsatisfactory, however, by

plaintiff's supervisor Betty Bowie based on a strict application of the company attendance policy. Ms. Bowie testified that she made this change even though she was aware that plaintiff's excessive absences were due to his efforts at correcting his knee problem.

20. As a result of the unsatisfactory appraisal, plaintiff did not receive the hardship transfer to the position of Plant Assigner, an inside job that required no pole climbing. It can be inferred from her testimony, that Ms. Bowie knew that the unsatisfactory appraisal would destroy plaintiff's chance of receiving a hardship transfer.

21. The Plant Assigner's position, a position with pay equal to that of a service technician, has since been phased out by defendant Southwestern Bell.

22. Plaintiff testified that he discussed the denial of his hardship transfer request with unnamed union representatives in 1982. Plaintiff concedes, however, that he never asked the union to process a grievance on his behalf with respect to that denial.

23. In November of 1982, plaintiff's immediate supervisor told plaintiff that his job required that he be able to climb poles using hooks.

24. At that time, plaintiff consulted another orthopedic surgeon, T.J. Oley, M.D., who informed plaintiff that surgery would be required in order to correct his knee problems. In an effort to save his job as service technician, plaintiff underwent knee surgery.

25. After his surgery in January of 1983, plaintiff remained on disability until May 1, 1983. When he returned to work, plaintiff was placed on light duty by the company. During this period, plaintiff retained his job title as service technician at the appropriate rate of pay.

26. During the period following surgery, plaintiff was required to wear an antero-lateral rotary knee brace.

27. The problems with plaintiff's knee persisted throughout 1983 and plaintiff remained under the care of Dr. Oley. Plaintiff remained on light duty during this period.

28. In May of 1984, plaintiff underwent additional surgery.

29. Following the surgery in May, plaintiff returned to work and was again placed on light duty. Plaintiff's supervisor notified plaintiff that he could not be carried in the service technician's job indefinitely on light duty. As a result, plaintiff requested and obtained from Dr. Oley a release permitting him to resume his pole climbing duties.

30. Plaintiff's efforts to resume his old job duties proved to be unsuccessful, and on August 23, 1984, plaintiff presented the company with a letter from Dr. Oley recommending that plaintiff's job be changed.

31. After receiving Dr. Oley's August 23, 1984 letter, Southwestern Bell transferred plaintiff to the lower paying position of Maintenance Administrator.

32. Following its receipt of Dr. Oley's August 23, 1984 letter, the Company originally had intended to move plaintiff to the position of Service Order Assignment Clerk (SOAC). However, plaintiff's Union Steward, Dale Dugas, when advised of this impending demotion, intervened on plaintiff's behalf, and negotiated a transfer for plaintiff to the position of Maintenance Administrator. The Maintenance Administrator position, though it produced a lower pay rate than plaintiff's old job as a Service Technician, produced a substantially higher rate of pay than the SOAC position.

33. After being notified that his reassignment was imminent, plaintiff had several discussions with his Union Steward, Dale Dugas. Basically, plaintiff requested that the Union file and process a grievance on his behalf protesting his demotion.

34. Testimony indicates that the Union considered plaintiff's request and investigated the circumstances of his demotion. In addition to the numerous discussions between Plaintiff and his Union Steward, Union Steward Dugas had numerous conversations with Union Vice-President Kerry Callaway regarding Plaintiff's situation and a comparison of that situation with

other similar cases. Ultimately, Kerry Callaway concluded that Plaintiff's grievance simply lacked merit, and that, in fact, the Union had already obtained for Plaintiff, by procuring him the reassignment to the Maintenance Administrator position, rather than the SOAC position, as good or greater relief than could ever be hoped to be obtained through the grievance procedure.

35. Plaintiff's Union Steward, Dale Dugas, advised him that it was the Union's position that his grievance lacked merit, and that the Union would not have a reasonable chance of successfully pursuing the matter.

36. Kerry Callaway testified that one factor which the Union considered in determining that it would not be advisable to pursue a grievance on plaintiff's behalf was the fact that relief had been obtained for plaintiff, in the transfer to Maintenance Administrator, rather than SOAC, which was, in the Union's mind, as good as anything that could have been obtained through the grievance procedure. It was the Union's belief that the initiation of any grievance on plaintiff's behalf would have necessarily resulted in plaintiff being assigned to the SOAC position, with an even more substantial loss of pay.

37. While the Union did not process a grievance on plaintiff's behalf over his demotion, based upon the Union's conclusion that such a grievance would have been futile, the Union did take other action on plaintiff's behalf. Among other things, plaintiff's Union Steward encouraged him to apply for other higher paying inside positions and obtained from plaintiff's supervisor an agreement to write a letter of recommendation for plaintiff to accompany any such applications. Plaintiff's Supervisor, Betty Bowie, did prepare such a letter of recommendation which was submitted with plaintiff's transfer requests for the positions of Repeater Technician and Switching Equipment Technician. Moreover, the Union Steward provided plaintiff with study materials to aid him in preparing to take the ESM Test, which is required for any employee transferring into the Switching Equipment Technician position. Despite these efforts, plaintiff failed one section of the ESM Test which resulted in his not receiving a transfer to the Switching Equipment Technician position. Plaintiff never tested for the Repeater Technician position. Following plaintiff's failure of the ESM Test, Dugas inquired, at plaintiff's request, as to the process for re-testing and provided such information to plaintiff.

38. Kerry Callaway testified that the Union did not consider plaintiff to be handicapped and, thus, it did not consider the nondiscrimination clause of the Collective Bargaining Agreement to be applicable to plaintiff's situation.

39. The testimony also indicates that defendant Southwestern Bell did not consider plaintiff to be handicapped.

40. Since the trial, the parties have agreed by joint stipulation that the nondiscrimination clause in the Collective Bargaining Agreement, Article XI, was not subject to the arbitration provisions of the Collective Bargaining Agreement.

41. There is no evidence that the Defendant Unions' refused to process Plaintiff's grievance because he was "handicapped" as that term is defined by statute. As noted above, the defendant Unions never considered plaintiff to be a handicapped employee.

42. Southwestern Bell's Affirmative Action Program is a Company sponsored document that does not impose any legal obligations or responsibilities on the defendant Unions. There is no evidence to indicate that the Affirmative Action Plan was the subject of any collective bargaining between the Company and the Unions. Neither the Federal nor State Statutes impose upon the defendant Unions obligations with respect to the Employer's Affirmative Action Program dealing with handicapped employees.

## CONCLUSIONS OF LAW

### A. GENERAL CONCLUSIONS

1. This Court has full and complete jurisdiction over the parties and subject mat-

ter of this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 185.

■ 2. At the outset, the Court must clarify an issue regarding plaintiff's pleadings in this action. In post-trial documents submitted to this Court, plaintiff has, for the first time, asserted a cause of action against the defendant Unions for breach of the collective bargaining agreement. This claim is presumably unrelated to plaintiff's § 301 claim for breach of the duty of fair representation. Specifically, what plaintiff now alleges is that the defendant Unions violated Article XI of the General Collective Bargaining Agreement. That clause prohibits the Company and the Union from "unlawfully" discriminating against any employee because he or she is handicapped. However, this Court will not permit plaintiff to assert this additional cause of action at this late date for the following reasons. First, this Court has searched every pleading and amended pleading filed by plaintiff and has found no evidence to indicate that plaintiff ever asserted such a cause of action. In addition, plaintiff has failed to come forth with, nor is this Court aware of, any authority that would permit plaintiff recovery under such a theory. Finally, it would seem that plaintiff is slightly confused about the impact of Article XI. Besides being nothing more than a generally worded restatement of policy, Article XI, standing by itself, creates no independent substantitive basis for recovery. Even absent the express prohibition in Article XI, the Company and/or Unions would presumably be in violation of the collective bargaining agreement if either acted with regard to a handicapped individual in a manner that was in violation of state or federal handicap discrimination laws.

■ 3. This is not to say, however, that this Court would hesitate to find this or any other Union in breach of its duty of fair representation if it failed to adequately and fairly represent a union member because he or she was handicapped. Such action would represent the clearest type of breach of the statutory duty of fair representation. *See Vaca v. Sipes,* 386 U.S. 171, 188, 87 S.Ct. 903, 915, 17 L.Ed.2d 842 (1967). In this case, however, as this Court noted in an earlier "Finding of Fact," there is no evidence from which it could be inferred that the defendant Unions' discriminated in their treatment of plaintiff because he was handicapped.

4. This case presents a number of difficult legal questions that this Court must address. First, whether the Unions breached the duty of fair representation owed to the plaintiff? Second, whether plaintiff must prove that the unions breached their duty as a prerequisite to recovery against defendant Southwestern Bell for breach of contract? Third, whether Southwestern Bell breached the collective bargaining agreement and/or its own affirmative action plan? And finally, whether plaintiff can recover against either the defendant Unions or Southwestern Bell under the Texas Human Rights Act?

## B. BREACH OF THE DUTY OF FAIR REPRESENTATION

■ 5. It is undisputed that a Union, acting as the exclusive bargaining representative of its members, has a duty to fairly represent its members under the scheme of the National Labor Relations Act. *Del Costello v. Teamsters,* 462 U.S. 151, 165, 103 S.Ct. 2281, 2291, 76 L.Ed.2d 476 (1983). A breach of the statutory duty of fair representation occurs when a union's conduct toward a member is "arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes,* 386 U.S. at 190, 87 S.Ct. at 916.

■ 6. The duty of fair representation does not, however, require unions to pursue grievance procedures in every case where an employee has a complaint against the employer. *Seymour v. Olin Corp.,* 666 F.2d 202, 208 (5th Cir.1982). It is well settled that the duty of fair representation "does not confer an absolute right on an employee to have his complaint carried through all stages of the grievance procedure." *Vaca,* 386 U.S. at 191, 87 S.Ct. at 917. Unions have considerable discretion in dealing with grievance matters, provided the treatment of an employee's complaint is neither arbitrary, discriminatory, or in bad

faith. *Id.* Subject to the duty of fair representation, a union is entitled to exercise its discretionary power to settle, abandon or even refuse to institute a grievance it believes to be without merit. *Vaca,* 386 U.S. at 191–192, 87 S.Ct. at 917–18; *Freeman v. O'Neal Steel, Inc.,* 609 F.2d 1123, 1126 (5th Cir.1980); *Harris v. Chemical Leaman Tank Lines, Inc.,* 437 F.2d 167, 171 (5th Cir.1971). In addition, a union may not discharge its representation duties in a perfunctory or otherwise inadequate manner. *Del Costello,* 462 U.S. at 164, 103 S.Ct. at 2290; *Vaca,* 386 U.S. at 191, 87 S.Ct. at 917. However, the union member bringing a lack of fair representation claim cannot meet his burden of proof by merely showing that the union representative might have been negligent or made a mistake in judgment by failing to proceed further with the complaint. *Findley v. Jones Motor Freight Division Allegheny Corp.,* 639 F.2d 953 (3rd Cir.1981); *Wyatt v. Interstate & Ocean Transport Co.,* 623 F.2d 888 (4th Cir.1980); *Nunn v. National Fresh Fruit & Vegetable Co., Inc.,* 541 F.Supp. 469, *aff'd.* 703 F.2d 556 (5th Cir. 1982).

 7. Plaintiff asserts two potential duty of fair representation violations. The first involved the unions' alleged failure to pursue plaintiff's 1981–82 grievance complaining of supervisor Walkoviak's policy requiring that service technicians utilize spikes rather than ladders to climb telephone poles. Defendants argue that this claim is time-barred. The Supreme Court has held that a § 301 fair representation suit against a union is governed by the six-month statute of limitations period contained in § 10(b) of the National Labor Relations Act. *Del Costello v. Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). Therefore, any claims against the unions arising out of events that occurred prior to September 12, 1984 would be time-barred. As such, plaintiff's first claim against the unions is clearly time-barred.

8. The second alleged violation of the duty of fair representation involves the unions' failure to formally pursue plaintiff's 1984 grievance request complaining about his demotion from service technician to maintenance administrator. Included within this second alleged violation is the question of whether the unions' failure to recognize plaintiff as a handicapped individual when considering his grievance request constitutes a breach of the duty of fair representation.

9. As this Court noted earlier, the duty of fair representation does not require a union to pursue grievance procedures whenever an employee has a complaint against his employer. *Seymour,* 666 F.2d at 208. Unions have a great deal of latitude in dealing with grievance matters and a union breaches its duty of representation only when it handles the employee's complaint in a manner that is arbitrary, discriminatory, or in bad faith. *Vaca,* 386 U.S. at 191, 87 S.Ct. at 917.

 This Court finds no evidence that would lead it to conclude that the Unions' response to plaintiff's complaint was either arbitrary or in bad faith. The facts indicate that the Union Steward, Dale Dugas, intervened on plaintiff's behalf prior to his demotion and, largely due to her efforts, plaintiff was placed in the higher paying Maintenance Administrator position instead of the Service Order Assignment Clerk position. In addition, the facts indicate that Ms. Dugas discussed plaintiff's situation with Union Vice-President Callaway on numerous occasions. Based on these discussions and a consideration of the company's position in similar cases, Mr. Callaway apparently reached two conclusions: First, that the Union would be unsuccessful if it filed a grievance regarding plaintiff's complaint and; second, that the filing of a grievance might cause plaintiff to be demoted to the lower paying Service Order Assignment Clerk position. Based on these facts, this Court cannot conclude that the Unions' actions were arbitrary or in bad faith.

 10. Plaintiff argues in his post-trial memorandum, however, that the Unions' breached their duty by failing to represent plaintiff "without invidious discrimination." *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 570, 96 S.Ct. 1048, 1059, 47

L.Ed.2d 231 (1976). As this Court indicated earlier in these Findings, if this were true this Court would not hesitate in finding that the Unions' breached their duty. The problem with plaintiff's theory, however, is that the facts do not support such a finding. Plaintiff cannot point to even one piece of direct evidence to support his contention that the Unions discriminated against him because of any handicap. Therefore, what plaintiff seems to argue is that this Court should conclude that the Unions discriminated against him based on circumstantial evidence. However, the only circumstantial evidence plaintiff can direct the Court's attention to is the fact that the Union refused to process plaintiff's grievance. The Union does not deny that it refused to process plaintiff's grievance. However, standing alone this is insufficient to support a finding of discrimination.

11. Finally, this brings us to the most difficult of plaintiff's breach of duty claims—whether the Union breached its duty by failing to recognize and consider plaintiff as a handicapped person. This Court concludes that it did not.

Assuming this Court did find that plaintiff met the definition of a handicapped person, as defined by state and/or federal law, plaintiff would still have the burden of proving that the Unions' failure to recognize him as a handicapped person was arbitrary, discriminatory, or in bad faith. In an attempt to fashion his case in a manner that fits this definition, plaintiff alleges that his request to the union that a grievance be filed on his behalf stated that he believed his demotion was the result of handicap discrimination by Southwestern Bell. If this were in fact true, and the Union simply ignored this fact, such action might constitute a breach of the duty. However, plaintiff's letter requesting that the Union file a formal grievance, states that he believed he was being demoted "due to medical reasons." *See* Plaintiff's Exhibit 8. Plaintiff's letter did not put the Union on notice of the fact that he believed he had been the victim of handicap discrimination. The question that then arises, of course, is whether in investigating plaintiff's claim the Union should have recognized that the Company's actions might possibly have amounted to handicap discrimination, and whether the Unions failure to do this would constitute a violation of their duty of representation. This Court cannot reach this conclusion. The Court finds nothing to indicate that the Union's failure to recognize the plaintiff as a handicapped person was either arbitrary, discriminatory, or done in bad faith. At most, this Court can find only that the Union made an error in judgment or was negligent in failing to consider whether plaintiff's claim was the result of handicap discrimination. This is simply not enough to overcome the heavy burden set forth in *Vaca v. Sipes, supra.*

## C. THE INTER–DEPENDENCY OF § 301 BREACH OF CONTRACT AND FAIR REPRESENTATION CLAIMS

12. Now that this Court has determined that the defendant Unions did not breach the statutory duty of fair representation, the question that arises is what effect, if any, this has on plaintiff's right to sue Southwestern Bell for alleged breach of contract.

13. Generally, when a collective bargaining agreement establishes a mandatory, binding grievance procedure and gives the Union the exclusive right to pursue claims on behalf of aggrieved employees, the results obtained by the union are normally conclusive of the employee's rights under the agreement. *See, e.g. Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976); *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). The policy behind this doctrine is that when a dispute arises within the scope of the collective bargaining agreement, the parties are relegated to the remedies which they provided in their agreement. *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965).

In such cases, where the Collective Bargaining Agreement provides the exclusive remedy, the employee's right to sue

his employer or his union or both is very limited, and in order to recover he must prove both that the union breached its duty of fair representation and that the employer breached the collective bargaining agreement. *See e.g.*, *Vaca*, 386 U.S. at 171, 87 S.Ct. at 903. Thus, the "indispensable predicate" for a § 301 action in this situation is a fair representation claim against the union. *United Parcel Service, Inc. v. Mitchell*, 451 U.S. 56, 62, 101 S.Ct. 1559, 1563, 67 L.Ed.2d 732 (1981).

14. The opposite is true, however, when the collective bargaining agreement does not provide that the grievance and arbitration procedure is the exclusive and final remedy for breach of contract claims. In these situations, the employee's right to sue his employer in federal court under § 301 is not conditioned on his first proving that the Union breached the duty of fair representation. *Vaca*, 386 U.S. at 183, 87 S.Ct. at 913; *Daigle v. Gulf State Utilities Co., Local No. 2286*, 794 F.2d 974 (5th Cir.1986). Therefore, the issue that must be resolved in this action is whether the collective bargaining agreement provides that the grievance and arbitration procedure is the exclusive and final remedy for a breach of contract claim involving the non-discrimination provision in Article XI.

15. The arbitration provision in Article IV of the 1983 Collective Bargaining Agreement is clear as to the finality and binding effect of a decision that proceeds through arbitration. The following are the relevant sections of Article IV:

Section 1. If during the term of this Agreement, with respect to the 1983 Departmental Agreement effective August 7, 1983, between the Union and the Company, and subsequent agreements which by specific reference therein are made subject to this Article, a difference shall occur, between the Union and the Company, and continue after all steps in the "Formal Grievance" procedure established in the 1983 Departmental Agreement shall have been undertaken and completed, regarding,

 a. the true intent and meaning of any specific provision or provisions thereof

(except as such provision or provisions relate, either specifically or by effect, to prospective modifications or amendments of such agreement), or

 b. the application of any provision or provisions thereof to any employee or group of employees, and grievances arising from such application, or

 c. the dismissal for just cause of any employee with more than one completed year's net credited service, or

 d. the disciplinary suspension for just cause of any employee

then in any such event, either the Union or the Management may submit the issue of any such matter to arbitration for final decision in accordance with the procedure hereinafter set forth or, where applicable, in accordance with Article V of this Agreement.

Section 2. In the event that either party hereto, within 60 days after completion of the Formal Grievance Procedure aforesaid, elects to submit a matter described in the preceeding section to arbitration the parties agree that the matter shall be so submitted, and agree that such submission shall be to one arbitrator....

 \* \* \* \* \* \*

Section 4. The decision of any, arbitrator, selected in accordance with Section 2 hereof, shall be final and the parties agree to be bound and to abide by such a decision.

16. The Grievance Procedure in Article XX does not, however, have included within it a provision similar to the one found in Article IV, Section 4. In fact, none of the paragraphs in Article XX even mention the finality or binding effect of a grievance that does not proceed past the Formal Grievance Procedure.

17. As noted earlier in these Findings, the parties have stipulated that under the 1983 Collective Bargaining Agreement the nondiscrimination clause, Article XI, was not subject to the arbitration provisions of the Collective Bargaining Agreement.

18. Defendant Southwestern Bell argues that although the nondiscrimination provision in Article XI was not arbitrable; "plaintiff still was bound to follow the con-

tract grievance procedures, and the Union had a right to strike in furtherance of grievant's complaint. That grievance procedure, therefore, was the exclusive and final remedy for breach of the collective bargaining agreement for purposes of Section 301." This Court does not agree with defendant's assertion.

19. The Collective Bargaining Agreement does not provide that the grievance procedure is the exclusive and final remedy for any breach of the Collective Bargaining Agreement. The Collective Bargaining Agreement is clear on this point. The exclusive and final remedy for breach of the agreement is the formal grievance procedure with the potential for submitting a dispute to arbitration if either party is not satisfied with the outcome of the grievance procedure. The means chosen by the parties for settlement of their disputes under the collective bargaining agreement was the combined grievance and arbitration procedures. Therefore, since plaintiff's claim for breach of the nondiscrimination provision in Article XI was not subject to arbitration, this Court finds that plaintiff's remedy under the grievance procedures in the contract was not the exclusive and final remedy for such disputes. *See Daigle*, 794 F.2d at 978; *Smith v. Kerrville Bus Company, Inc.*, 748 F.2d 1049, 1054 (5th Cir. 1984).

20. It should be noted, that this decision is based on this Court's interpretation of the parties intent under the Collective Bargaining Agreement. First, the agreement indicates that the parties intended that arbitration would act as the final step of the dispute resolution mechanism. Nowhere in the agreement does it state that the grievance procedure alone would serve as the complete dispute resolution process for any breach of the contract. Second, if as defendant Southwestern Bell suggests, the grievance procedure absent arbitration was intended to be the exclusive and final remedy for Article XI disputes, then why didn't the parties make this distinction clear in the agreement itself. Certainly, experienced contract negotiators such as Southwestern Bell and the Communication Workers of America would understand the importance of making such a limited excep-

tion painfully clear if it was in fact what they had intended. This Court does not, however, believe that this was in fact the intent of the parties here. Finally, if the Court were to accept as true defendant Southwestern Bell's contention that the grievance procedure provides the exclusive and final remedy for a claim arising under Article XI, employees such as the plaintiff would be left with a wholly inadequate method of having their disputes resolved. Therefore, this Court must reject Southwestern Bell's position with respect to this issue.

It should be noted, that this Court does not intend to imply by this ruling that an employee has an unconditional right to have every disagreement processed through the grievance procedure and ultimately to arbitration. Such a finding would, as defendant points out, be in direct conflict with the Fifth Circuit's holding in *Haynes v. United States Pipe & Foundry Co.*, 362 F.2d 414 (5th Cir.1966). This case, however, is factually distinguishable from *Haynes, supra,* where the Collective Bargaining Agreement expressly provided that "[a]ny settlement between the Company and the Union at any step of the [above] grievance procedure, shall be binding on the Company and the Union and the aggrieved." *Haynes*, 362 F.2d at 416. As this Court noted earlier, there is no similar expression of the parties intent in the Collective Bargaining Agreement at issue here.

22. Since this Court finds that the Collective Bargaining Agreement does not provide that the grievance procedure is the exclusive and final remedy for a breach of Article XI, plaintiff's right to sue his employer for breach of contract is not preempted by the fact that plaintiff has failed to show that the defendant Unions' breached the statutory duty of fair representation.

D. PLAINTIFF'S CLAIM AGAINST SOUTHWESTERN BELL FOR BREACH OF CONTRACT AND/OR VIOLATION OF ITS AFFIRMATIVE ACTION PLAN.

23. As noted earlier in these Findings, the nondiscrimination clause in Article XI

of the 1983 Collective Bargaining Agreement prohibits Southwestern Bell from "unlawfully" discriminating against any employee because he or she is handicapped. The full text of Article XI provides:

> In the desire to restate their respective policies, neither the Company nor the Union shall unlawfully discriminate against any employee because of such employee's race, color, religion, sex, age, or national origin or because he or she is handicapped, a disabled veteran or a veteran of the Vietnam era.

Plaintiff argues that this Court must interpret this generally worded prohibition against discrimination without reference to state or federal law. This Court cannot agree with plaintiff's assertion.

■ The use of the word "unlawfully" clearly shows an intention to interpret this provision of the contract in a manner consistent with some outside body of state or federal law. Furthermore, Article XI begins by noting that the nondiscrimination clause is provided merely to "restate" the parties "respective policies" regarding discrimination. The clearest statement of the Company's policy with regard to these matters is Southwestern Bell's Affirmative Action Plan. That document provides the following policy statement:

> It is the policy of Southwestern Bell Telephone Company, consistent with other equal employment responsibilities, to provide equal employment opportunity to handicapped individuals, special disabled veterans and veterans of the Vietnam era who are qualified for jobs which are within their capabilities to perform in a manner safe to themselves, their co-workers, the general public and consistent with efficient operation of the business.
>
> This document represents the Company's commitment to a policy of providing equal employment opportunity for handicapped people, special disabled veterans and veterans of the Vietnam era in all aspects of the employer-employee relationship. This includes recruiting, administering job listing requirements, hiring, transfers, upgrades and promotions, conditions and privileges of employment, company sponsored training, educational assistance, social and recreational programs, compensation, benefits, discipline, layoffs, recalls, and termination of employment without unlawful discrimination because of physical or mental handicaps or disabilities.
>
> Southwestern Bell Telephone Company pledges itself to a program of affirmative action aimed at assuring equality of employment and providing reasonable accommodations to the physical and mental limitations of job applicants and employees. No individual will be unlawfully discriminated against because of a physical or mental handicap or disability. All employment and advancement decisions will be based solely upon the objective determination of each candidate's job qualifications.

On the page immediately following this policy statement, the Company provides an introduction that begins with the following paragraph:

> This document is Southwestern Bell Telephone Company's Affirmative Action Program developed to comply with federal regulations implementing Section 503 of the Rehabilitation Act of 1973, as amended and Section 402 of the Vietnam Era Veterans' Readjustment Assistance Act of 1974*. It describes the policy, practices, and procedures implemented in employing and advancing, at all levels of management and non-management, qualified handicapped persons, special disabled veterans and veterans of the Vietnam era without unlawful discrimination.

■ Therefore, since the Company's Affirmative Action Program was developed to comply with federal regulations implementing Section 503 of the Rehabilitation Act of 1973, then with reference to the Company this Court will interpret Article XI of the Collective Bargain Agreement to mean that it is Southwestern Bell's policy not to unlawfully discriminate against a handicapped individual in a manner inconsistent with its own Affirmative Action Plan or Section 503 of the Rehabilitation Act of 1973.

24. In addition, the Affirmative Action Program also provides the plaintiff with a separate right of action against the Company. However, since the nondiscrimination clause in the Collective Bargaining Agreement will be interpreted in a manner consistent with the Company's Affirmative Action Program, this Court will, for purposes of these Findings and Conclusion, consolidate plaintiff's breach of contract claim with any separate right of action that exists under the Affirmative Action Program.

25. To establish a violation of either the Company's Affirmative Action Program, Article XI of the Collective Bargaining Contract, or for that matter federal law[1], plaintiff must meet a two-part test. First, plaintiff must show that he is a "handicapped" individual under the law. Second, after establishing that he is handicapped, plaintiff must establish that he is a "qualified handicapped individual," that is one who is capable of performing the job in question with or without reasonable accomodation. *See Plummer by Plummer v. Branstad*, 731 F.2d 574, 577 (9th Cir.1984); *Strathie v. Department of Transportation*, 716 F.2d 227, 230 (3rd Cir.1983); *Joyner by Lowry v. Dumpson*, 712 F.2d 770, 774 (2d Cir.1983).

26. The threshold question then, is to determine whether plaintiff meets the definition of "a handicapped individual." The Company's Affirmative Action Program defines a handicapped individual in the following manner:

"A HANDICAPPED INDIVIDUAL" is one who (1) has a physical or mental impairment which substantially limits one or more of such person's major life activities; (2) has a record of such impairment or (3) regarded as having such an impairment.[2]

27. For purposes of this action, the dispute concerns whether plaintiff can prove that he "has a physical or mental impairment which substantially limits" one or more of his "major life activities." For assistance in making this determination, the program provides two additional definitions:[3]

"SUBSTANTIALLY LIMITS" means the degree to which the impairment affects employability. A handicapped person who is likely to experience difficulty in securing, retaining or advancing in employment would be considered substantially limited.

"LIFE ACTIVITIES" may be considered to include communication, ambulation, self-care, socialization, education, vocational training, employment, transportation, adapting to housing, etc. For the purposes of Section 503 of the Act, primary attention is given to those life activities that affect employability.

28. It seems clear, under the Fifth Circuit's broad definition of the term "impairment," that plaintiff's knee problem constitutes a physical impairment. *See de La Torres v. Bolger*, 781 F.2d 1134 (5th Cir.1986). In *de la Torres, supra*, the Court held that the term impairment "cannot be divorced from its dictionary and common sense connotation of a diminution in quality, value, excellence or strength." *Id.* at 1138. The court found that "logic, reasoned precedent, and the EEOC regulations[4]" should be used by a district court

---

1. It should be noted that plaintiff has not brought a separate claim under Section 504 of the Rehabilitation Act, presumably because he cannot prove that his discrimination involved "any program or activity receiving Federal Financial Assistance." 29 U.S.C. § 794. Therefore, in this action the Federal Rehabilitation Act of 1973 is useful only because the company has drawn reference to, and in fact has modeled, its affirmative action program after the Act.

2. The Affirmative Action Plan indicates that this definition was taken from the definitions found in 41 C.F.R. 60–741.

3. The Affirmative Action Program indicates that these definitions were also taken from the definitions in 41 C.F.R. 60–741.2.

4. The EEOC regulations which the Court alluded to were the following:

(b) "Physical or mental impairment" means (1) any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: Neurological; musculoskeletal; special sense organs; cardiovascular; reproductive; digestive; genito-urinary; hemic and lymphatic; skin; and endocrine; or (2) any mental or psychological disorder, such as

when considering what constitutes an "impairment" under the Act. *Id.*

■ Based on the Fifth Circuit's holding in *de la Torres, supra,* and the plain meaning of the definitions in Southwestern Bell's Affirmative Action Program, this Court finds that plaintiff's knee problem constitutes a physical impairment. This does not, however, end the inquiry, since it still must be shown that this physical impairment "substantially limits" some of plaintiff's "major life activities."

■ 29. The question of whether an impairment constitutes a substantial limitation to a major life activity is best suited to a "case-by-case determination." *Forrisi v. Bowen,* 794 F.2d 931 (4th Cir.1986); *E.E. Black, Ltd. v. Marshall,* 497 F.Supp. 1088, 1100 (D.Hawaii 1980). A court should assess the effects of various impairments upon varied individuals. *Id.* "The inquiry is, of necessity, an individualized one—whether the particular impairment constitutes for the particular person a significant barrier to employment." *Forrisi,* 794 F.2d at 933. Relevant to the inquiry are "the number and type of jobs from which the impaired individual is disqualified, the geographical area to which the individual has reasonable access, and the individual's job expectations and training." *Forrisi,* 794 F.2d at 933; *Jasany v. United States Postal Service,* 755 F.2d 1244, 1249 (6th Cir. 1985); *See also de la Torres v. Bolger,* 610 F.Supp. 593, 596–97 (N.D.Tex.1985), *aff'd.,* 781 F.2d 1134 (5th Cir.1986).

In interpreting the federal regulations, courts have noted that the language requiring a "substantial" limitation of a "major" life activity "emphasizes that the impairment must be a significant one." *Forrisi,*

*supra.* "It was open to congress to omit these limiting adjectives, but Congress did not do so." *Id.; Tudyman v. United Airlines,* 608 F.Supp. 739, 745 (C.D.Cal.1984). In discussing the purpose behind the Rehabilitation Act, the Fourth Circuit has noted:

> The Rehabilitation Act assures that truly disabled, but genuinely capable, individuals will not face discrimination in employment because of stereotypes about the insurmountability of their handicaps. It would debase this high purpose if the statutory protections available to those truly handicapped could be claimed by anyone whose disability was minor and whose relative severity of impairment was widely shared. Indeed, the very concept of an impairment implies a characteristic that is not commonplace and that poses for the particular individual a more general disadvantage in his or her search for satisfactory employment.

*Forrisi,* 794 F.2d at 934; *Jasany,* 755 F.2d at 1249.

In *Forrisi v. Bowen, supra,* the Fourth Circuit considered these definitions under facts similar to those in the case now before this Court. In *Forrisi, supra,* the plaintiff was employed as a utility systems repairer and operator. *Forrisi,* 794 F.2d at 933. The job description required that the employee be able to climb stairs and ladders both for emergencies and for routine maintenance. *Id.* When plaintiff informed his supervisor that he had acrophobia and could not, therefore, climb certain heights he was terminated. *Id.* In finding that plaintiff's acrophobia did not constitute a substantial limitation to plaintiff's major life activities, the Fourth Circuit made the following observations:

mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

(c) "Major life activities" means functions, such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

(d) "Has a record of such an impairment" means has a history of, or has been classified (or misclassified) as having a mental or physical impairment that substantially limits one or more major life activities.

(e) "Is regarded as having such an impairment" means (1) has a physical or mental impairment that does not substantially limit major life activities but is treated by an employer as constituting such a limitation; (2) has a physical or mental impairment that substantially limits major life activities only as a result of the attitude of an employer toward such impairment; (3) or has none of the impairments defined in (b) of this section but is treated by an employer as having such an impairment.

29 C.F.R. § 1613.702(b)–(e).

Several courts have previously addressed this issue, deciding unanimously that an employer does not necessarily regard an employee as handicapped simply by finding the employee to be incapable of satisfying the singular demands of a particular job. *See de la Torres v. Bolger*, 610 F.Supp. 593, 597 (N.D.Tx.1985) (employer regarded employee as left-handed); *Tudyman v. United Airlines*, 608 F.Supp. at 746 (employer regarded employee as overweight); *E.E. Black, Ltd. v. Marshall*, 497 F.Supp. at 1101.

\* \* \* \* \* \*

Far from being regarded as having a "substantial limitation" in employability, Forrisi was seen as unsuited for one position in one plant—and nothing more. As one court has noted, adoption of Forrisi's reasoning would imply that anyone who failed to obtain a single job because of a single requirement of employment would become a handicapped individual because the employer would thus be regarding the applicant's failure as a handicap. *Tudyman v. United Airlines*, 608 F.Supp. at 746. Such a reading would stand the Act on its head. The Rehabilitation Act seeks to remedy perceived handicaps that, like actual disabilities, extend beyond this isolated mismatch of employer and employee.

*Forrisi*, 794 F.2d at 935; *see also Jasany v. United States Postal Service*, 755 F.2d 1244; *E.E. Black, Ltd. v. Marshall*, 497 F.Supp. 1088 (an impairment that interferred with an individual's ability to do a particular job, but did not significantly decrease that individual's ability to obtain satisfactory employment otherwise, was not "substantially" limiting within the meaning of the statute); *Salt Lake City Corp. v. Confer*, 674 P.2d 632, 636–37 (Utah 1983) ("one particular job for one particular employer cannot be a 'major life activity' ").

In the present action, plaintiff's knee problem is an impairment that makes him unsuited only for positions at Defendant Southwestern Bell requiring pole climbing.

There is no evidence that indicates that plaintiff's injury disqualifies him from any other position with the Company. Furthermore, plaintiff produced no evidence to show that his impairment effected any activity other than his ability to climb telephone poles. Plaintiff testified that he continued to engage in other life activities, including recreational activities such as bowling. The facts indicate that the antero-lateral knee brace prescribed by plaintiff's doctor was designed to help strengthen any weakness still present in plaintiff's knee. Plaintiff testified on cross-examination that he was not required to wear the knee brace at all times, and in fact he does not wear the brace while performing the duties in his present position as Maintenance Administrator.

Based on these facts, this Court must conclude that plaintiff has failed to meet the Affirmative Action Program and statutory definition of the term "handicapped individual." While plaintiff does have a physical impairment, that impairment is not one that "substantially limits" plaintiff's "major life activities." [5] The only major life activity effected by plaintiff's impairment is his ability to "work," and the limitation placed on his employability is far from "substantial." Plaintiff's impairment disqualifies him for only those positions requiring climbing. Plaintiff is qualified for all other positions within Southwestern Bell, as evidenced by the fact that he is presently employed in a position not requiring pole climbing. To find that plaintiff's *physical impairment substantially limits his major life activities* would require this Court to go against the weight of the authority on this issue. *See e.g., Forrisi v. Bowen*, 794 F.2d 931; *Jasany v. United States Postal Service*, 755 F.2d 1244. Therefore, this Court cannot find that plaintiff meets the definition of "a handicapped individual."

30. Since plaintiff has failed to meet the threshold requirement of proving that he is a handicapped individual, as that term is defined in the Company's Affirmative Ac-

---

**5.** 45 C.F.R. § 84.3(j)(2)(ii) defines "Major Life Activities" as "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."

tion Plan and by law, it is unnecessary to address the remaining issues relating to this claim. Therefore, this Court finds that plaintiff has failed to carry his burden of proof with regard to the claims against defendant Southwestern Bell for breach of the Collective Bargaining Agreement and for violating the Affirmative Action Program.

### E. PLAINTIFF'S CLAIM UNDER THE TEXAS HUMAN RIGHTS ACT

31. The final issue that this Court must consider is whether plaintiff may recover against either the defendant Unions or Southwestern Bell under the Texas Commission on Human Rights Act.

■■■ 32. Plaintiff's claim for relief under the Texas Commission on Human Rights Act is not preempted by federal labor policies. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). As this Court has noted previously in these Findings, the nondiscrimination provision in Article XI of the Collective Bargaining Agreement was not subject to arbitration and, as such, it failed to provide plaintiff with an adequate method for having his dispute resolved. Therefore, it would be ludicrous for this Court to find, as defendant suggests, that Section 301, 29 U.S.C. § 185, preempts plaintiff's state law handicap discrimination claim because that claim was somehow covered by the Collective Bargaining Agreement. *See Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985).

33. Section 5.01 of the Texas Commission on Human Rights Act (hereinafter "Texas Handicap Act") provides:

Sec. 5.01. It is an unlawful employment practice for an employer:

(1) to fail or refuse to hire or to discharge an individual or otherwise to discriminate against an individual with respect to compensation or the terms, conditions, or privileges of employment because of race, color, handicap, religion, sex, national origin, or age;

34. Similarly, Section 5.03 of the Act provides:

Sec. 5.03. It is an unlawful employment practice for a labor organization:

(1) to exclude or to expel from membership or otherwise to discriminate against an individual because of race, color, handicap, religion, sex, national origin, or age;

(2) to limit, segregate, or classify members or applicants for membership or to classify or to fail or refuse to refer for employment an individual because of race, color, handicap, religion, sex, national origin, or age in a way:

(a) that would deprive or tend to deprive an individual of employment opportunities; or

(b) that would limit employment opportunities or otherwise adversely affect the status of an employee or of an applicant for employment; or

(c) that would cause or attempt to cause an employer to violate this article.

Tex.Rev.Civ.Stat.Ann. art. 5221K, Sec. 5.01, 5.03 (Vernon Pamp.Supp.1985).

35. The definitional section of the Act provides the following definitions of the terms "handicapped person" and "handicap":

(7)(A) "Handicapped person" means a person who has a mental or physical handicap, including mental retardation, hardness of hearing, deafness, speech impairment, visual handicap, being crippled, or any other health impairment that requires special ambulatory devices or services, as defined in Section 121.002(4), Human Resources Code, but does not include a person because he is addicted to any drug or illegal or federally controlled substances or because he is addicted to the use of alcohol.

(B) "Handicap" means a condition either mental or physical that includes mental retardation, hardness of hearing, deafness, speech impairment, visual handicap, being crippled, or any other health impairment that requires special ambulatory devices or services, as defined in Section 121.002(4), Human Resources Code, but does not include a condition of addiction to any drug or illegal

or federally controlled substances or a condition of addiction to the use of alcohol.

Tex.Rev.Civ.Stat.Ann. art. 5221K, Sec. 2.01(7)(A) and (B).

36. Generally, the Act provides that it should be construed according to "the fair import of its terms." *Id.* at Sec. 1.03. However, Section 1.04(b) provides a specific rule of construction that is important to the resolution of this matter:

> (b) In Article 5, "because of handicap" or "on the basis of handicap" refers to discrimination because of or on the basis of a physical or mental condition that does not impair an individual's ability to reasonably perform a job.

*Id.* at Sec. 1.04(b).

37. This Court can find no decisional law construing the Texas Handicap Act. However, the Act provides that the general purpose of the Act is "to provide for the execution of the policies embodied in Title VII of the Federal Civil Rights Act of 1964, ... and to create an authority that meets the criteria under 42 U.S.C. Section 2000e–5(c) and 29 U.S.C. Section 633." *Id.* at Sec. 1.02(1). Therefore, consistent with the Act's general policy, this Court will, wherever necessary, construe the Act in a manner consistent with federal precedent.

■ 38. Construing the Act according to the fair import of its terms, this Court finds that plaintiff has the initial burden of establishing the following elements in order to prove his prima facie case. First, plaintiff must establish that he is "a handicapped person," as that term is defined under the Act. Second, if plaintiff establishes that he is handicapped, then he must show that he was discriminated against "because of handicap" or "on the basis of handicap." Finally, if plaintiff can prove the above two elements, then he must establish that he was demoted under circumstances which give rise to the inference that his demotion was based solely on his handicap.

Once plaintiff establishes his prima facie case, defendants have the burden of going forward and proving that plaintiff was not demoted "because of handicap" or "on the

basis of handicap", or that the demotion was the result of an employment practice that was "not intentionally devised or operated to contravene the prohibitions of this Act and is justified by business necessity." *See* Tex.Rev.Civ.Stat.Ann. art. 5221K, Sec. 5.07(a)(7). These standards are consistent with the standards applied in federal handicap discrimination and Title VII actions. *See Jasany v. United States Postal Service,* 755 F.2d 1244, 1249 n. 5 (6th Cir.1985); *Puskin v. Regents of University of Colorado,* 658 F.2d 1372, 1386–87 (10th Cir. 1981).

■ 39. Therefore, the threshold question is whether plaintiff is "a handicapped person" under the Act. Under the Act, a person is handicapped if he has a health impairment that requires a special ambulatory device. Although there is some dispute as to whether plaintiff is "required" to wear the antero lateral rotary knee brace prescribed by his doctor, this Court finds that plaintiff's brace constitutes an ambulatory device. Therefore, for purposes of the Act plaintiff is "handicapped."

■ 40. The second step is to determine whether plaintiff's employment status or membership status was affected because of his handicap or on the basis of his handicap. As noted previously in these findings, there was no evidence presented that would indicate that the defendant Unions' refused to process plaintiff's grievance because he was handicapped. Therefore, plaintiff's claim against the defendant Unions under the Texas Handicap Act must fail.

41. Similarly, this Court finds that plaintiff has failed to establish the second element of his claim against defendant Southwestern Bell. As noted earlier, the Act defines "because of handicap" or "on the basis of handicap" as discrimination because of or on the basis of a physical condition that "does not impair an individual's ability to reasonably perform a job." Tex.Rev.Civ.Stat.Ann. art. 5221K, Sec. 1.04(b). There is no decisional law construing the phrase "does not impair an individual's ability to reasonably perform a job."

However, this Court finds that this requirement is substantially similar to the "otherwise qualified" requirement under Section 504 of the Rehabilitation Act of 1973. 29 U.S.C. § 794 (1985). The United States Supreme Court has defined an "otherwise qualified person" as "one who is able to meet all of a program's requirements in spite of his handicap." *Southeastern Community College v. Davis*, 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979). In the employment context, an otherwise qualified person is one who can perform "the essential functions" of the job in question. 45 C.F.R. § 84.3(K) (1985).

In the present action, the primary functions of the service technician's job are to install, service and remove customers' telephone equipment. The job description and the evidence presented suggest that an essential requirement of this job is that the employee be able to climb telephone poles to perform the primary functions of the job. While plaintiff did present evidence that indicates that the amount of pole climbing done by service technicians varies depending on the area in South Texas, this standing by itself is not sufficient to permit this Court to find that Southwestern Bell discriminated against plaintiff by demoting him when he became unable to climb poles. In short, this Court finds that plaintiff's physical condition impairs his ability to reasonably perform a job that requires pole climbing.

In addition, even assuming that this Court did find that plaintiff was demoted solely because of his handicap, the defendant is still permitted under the Act to come forward with evidence that the discrimination was the result of an employment practice not intentionally devised or operated to contravene the prohibitions of the Act and is justified by business necessity. The "Plan of Action" Section in Southwestern Bell's Affirmative Action Program indicates that the company is committed to reviewing the functional job requirements of each position "to ensure that they contain only job related criteria and are consistent with business necessity and the safe performance of the jobs." Based on this

and the testimony presented at trial, this Court finds that defendant Southwestern Bell's requirement that service technicians maintain the ability to climb telephone poles was not intentionally devised or operated to contravene the prohibitions of the Texas Handicap Act and is justified by business necessity.

### CONCLUSION

Accordingly, this Court ORDERS, ADJUDGES, and DECREES that the plaintiff, Jimmy S. Elstner, shall TAKE NOTHING from the defendants, Southwestern Bell Telephone Company, Communication Workers of America, and CWA Local 12222.

Counsel shall submit an appropriate judgment incorporating by reference the above Findings of Fact and Conclusions of Law for entry by the court within twenty (20) days.