Peter W. McINTYRE, Plaintiff,

v.

The KROGER CO., Defendant.

Civ. A. No. 3–92–CV–1508–R.

United States District Court,
N.D. Texas,
Dallas Division.

Feb. 28, 1994.

Steven Benyon Thorpe, Crews Thorpe & Hatcher, Dallas, TX, for plaintiff.

Michael Prospero Maslanka, Clark West Keller Butler & Ellis, Dallas, TX, for defendant.

## MEMORANDUM OPINION AND ORDER

BUCHMEYER, District Judge.

Now before this Court is the Motion for Summary Judgment filed by The Kroger Co.

("Defendant"). For the following reasons, Defendant's Motion for Summary Judgment is **GRANTED**.

### Background Facts

Peter W. McIntyre ("Plaintiff") was employed by Defendant for approximately five and one-half years. For about five of those years, Plaintiff was employed at Store No. 450. During that time, he was supervised by three different store managers, Susan Abbot, Joe Cornwell, and James Weaver. In the fall of 1990, Plaintiff became the grocery manager at Store No. 209, where he was supervised by Nick Benavidez. Unhappy with Plaintiff's performance as grocery manager, Larry Hatcher (Mr. Benavidez's immediate subordinate) issued a constructive advice record against Plaintiff on November 28, 1990. In that constructive advice record, Plaintiff was informed that if he did not improve his performance, he would be subject to further "disciplinary action up to and leading to termination." On December 2, 1990, another constructive advice record was issued against Plaintiff, this time by Mr. Benavidez, citing Plaintiff's failure to keep sale items stocked for purchase by customers. Plaintiff had been verbally warned about this failure the previous day. As a result of this second constructive advice record, Plaintiff was placed on probation until May 2, 1991.

Also on December 2, 1990, a constructive advice record was issued against Plaintiff by his immediate supervisor, David Charles, for Plaintiff's failure to "work on the conditioning of the store" as instructed, and for failing to "check up on" his work crew. Plaintiff was warned verbally and in writing by Mr. Charles that further discipline would be rendered, leading to termination, if Plaintiff did not improve his performance. Specifically, Mr. Charles recorded the following comments:

> Very few times does the job required get completed. The times it does, is unsatisfactory and will no longer be tolerated. Pete is well aware of what's expected, per str. mgr. and co-mgr., its Pete (sic) responsibility to make it happen—This did not happen which resulted in overtime—Pete

has been told there is no excuse for bad store conditions and none will be accepted . . .

Plaintiff took a one week vacation in early December 1990. Prior to his departure, Mr. Benavidez informed Plaintiff that if he could not perform as a grocery manager he would be terminated, and that he would not be allowed to transfer to the bargaining unit as a retail clerk. When Plaintiff returned from his one week vacation, he delivered to Mr. Benavidez a document from a physician, Charles Tubbs, recommending that Plaintiff be allowed a medical leave for approximately six weeks for a "health disorder." The note did not specify the nature of the health disorder.

When he returned to work in February, 1991, after six weeks of leave, Plaintiff brought two notes, one from Dr. Kathryn Sommerfelt and one from Barbara Polk, CSW-ACP, suggesting that he be allowed to transfer from the position of grocery manager to that of a retail clerk. Neither of the notes provided any reason for the suggested transfer. It is uncontroverted that at no time after returning to work did Plaintiff inform any of his managers that he was undergoing treatment for depression, nor did Mr. Benavidez ever say anything to Plaintiff to suggest that he knew Plaintiff was undergoing treatment for depression.

On March 19, 1991, Plaintiff was issued another constructive advice record, signed by Mr. Benavidez, and his probation date was extended until June of 1991. This corrective action criticized the quality and quantity of Plaintiff's work, and explained that he failed to follow instructions.

Again, on March 28, 1991, Plaintiff was issued a constructive advice record. This time, Mr. Benavidez informed him that any future occurrences like the one for which the constructive advice record was made would result in a one week suspension without pay. Finally, on April 12, 1991, as the result of another constructive advice record, Plaintiff was suspended for one week without pay. In the constructive advice record, Plaintiff was told that any future failure to perform his job would result in termination from the Kroger Company. After returning to work from this

suspension, Plaintiff was once again given a written instruction regarding his poor performance. As of May 13, 1991, Plaintiff was terminated.

Plaintiff commenced this action in March, 1992 in the 193rd Judicial District Court, Dallas County, Texas, alleging that Defendant discriminated against Plaintiff[1] in violation of the Texas Commission on Human Rights Act, Article 5221k of the Revised Civil Statutes of the State of Texas. This action was removed to this Court on July 23, 1992.

## *Analysis*

### *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure allows summary judgment only where there is no genuine issue as to any material fact and the moving party is entitled to summary judgment as a matter of law.[2] All reasonable doubts and inferences must be decided in the light most favorable to the party opposing the motion.[3] Indeed, as long as there appears to be some evidentiary support for the disputed allegations, the motion must be denied.[4] Finally, a summary judgment motion may be "opposed by any kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves ..."[5]

Plaintiff claims Defendant discriminated against him because he was a "disabled person," which discrimination is prohibited by the Texas Commission on Human Rights Act, Tex.Rev.Civ.Stat.Ann. art. 5221k[6], (Vernon, 1991) ("TCHRA"). Article 5, Section 5.01 of the TCHRA provides that

It is an unlawful employment practice for an employer:

(1) to fail or refuse to hire or to discharge an individual or otherwise to dis-

criminate against an individual with respect to compensation or the terms, conditions, or privileges of employment *because of* race, color, disability, religion, sex, national origin, or age; or

(2) to limit, segregate, or classify an employee or applicant for employment in a way that would deprive or tend to deprive an individual of employment opportunities or otherwise adversely affect the status of an employee because of race, color, disability, religion, sex, national origin, or age.

Article 2, Section 2.01(4) defines "disability" as follows:

"Disability" means a mental or physical impairment that substantially limits at least one major life activity or a record of such a mental or physical impairment. The term does not include:

(a) a person with a current condition of addiction to the use of alcohol or any drug or illegal or federally controlled substance; or

(b) a person with a currently communicable disease or infection, including but not limited to acquired immune deficiency syndrome or infection with the human immunodeficiency virus, that constitutes a direct threat to the health or safety of other persons or that makes the affected person unable to perform the duties of the person's employment.

 To sustain an action under art. 5221k, Plaintiff must establish three elements: (1) that he is a disabled person as defined in the TCHRA; (2) that he was discriminated against *because of* his disability; *and* (3) that the decision to terminate

---

**1.** In his response to Defendant's Motion for Summary Judgment, Plaintiff complains that this alleged discrimination involved more than Defendant's decision to terminate him, but also involved "a course of conduct" by Defendant including harassment and a "totally unjustified refusal" to permit Plaintiff to downgrade to the bargaining unit.

**2.** Fed.R.Civ.P. 56(e).

**3.** *Thornbrough v. Columbus and Greenville R.R. Co.,* 760 F.2d 633, 640 (5th Cir.1985).

**4.** *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Coke v. General Adjustments Bureau,* 640 F.2d 584, 595 (5th Cir.1981) (en banc)).

**5.** *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**6.** All of the alleged unlawful employment practices made the subject of plaintiff's pleadings took place in 1990 and 1991. References to the Act are thus to the statute prior to September 1, 1993, the effective date of the 1993 amendments.

him was based solely on his disability.[7] Clarifying the meaning of Article 5, § 1.04(b) of the TCHRA provides that "because of disability" or "on the basis of disability," as stated in § 5.01, refers to "discrimination because of or on the basis of a physical or mental condition that does not impair an individual's ability to reasonably perform a job." § 1.04(b) elucidates the underlying purpose of the TCHRA—that employers will not discriminate against certain protected persons for reasons other than their ability to perform a job. In fact, declaration of that purpose is made explicit in § 1.02:

> PURPOSES. The general purposes of this Act are:
>
> (1) to provide for the execution of the policies embodied in Title VII of the federal Civil Rights Act of 1964 as amended (42 U.S.C. Section 2000e et seq.), and to create an authority that meets the criteria under 42 U.S.C. Section 2000e–5(c) and 29 U.S.C. Section 633; and
>
> (2) to secure for persons within the state, including disabled persons, freedom from discrimination in certain transactions concerning employment, and thereby to protect the personal dignity of persons within the state; and to make available to the state the full productive capacities of those persons, to secure the state against domestic strife and unrest, to preserve the public safety, health, and general welfare, and to promote the interests, rights, and privileges of persons within the state.

 Protection of these stated goals is assured by requiring that Plaintiff show at least some evidence that Defendant's termination decision was *based on* Plaintiff's purported disability. Assuming, for purposes of analysis, that Plaintiff's condition satisfies the definition of "disability," and thus that Plaintiff might be successful in establishing that the first element of the three prong test

for making out a claim of discrimination under the TCHRA has been met, the Court finds that Plaintiff has put forth no evidence tending to establish the second and third elements required by the three prong test.[8]

Plaintiff has failed to put forth any evidence that Defendant had knowledge of his alleged disability other than the bare allegations contained in his response to Defendant's Motion for Summary Judgment. In fact, in the deposition testimony attached as an exhibit to Defendant's Motion for Summary Judgment, Plaintiff admits that he never informed Mr. Benavidez that he was being treated for depression:

> Q. Did you and Mr. Benavidez, sir, ever discuss in any way, shape or form whether you were undergoing treatment for depression?
>
> A. No.
>
> Q. Did you ever tell Mr. Benavidez in any way, shape or form that you were undergoing treatment for depression?
>
> A. No.
>
> Q. Did Mr. Benavidez ever say anything to you to suggest that he knew you were undergoing treatment for depression?
>
> A. No.[9]

 The Court will not impute knowledge of Plaintiff's alleged disability upon his employer where no communication of that disability was ever given to his employer. Unlike race, age, or physical disability, Plaintiff claims that he suffered from depression, a condition not readily apparent to lay persons. Knowledge by an employer that its employee is suffering from depression must therefore arise by other means, i.e. statements by the employee himself or statements from medical personnel familiar with that particular employee's condition.

 Plaintiff points to Defendant's vacation time, six-week leave request and the

---

7. *Elstner v. Southwestern Bell Telephone Co.*, 659 F.Supp. 1328, 1345 (S.D.Tex.1987) (emphasis added).

8. Generally, whether the three elements of the test have been met is a question of fact for the factfinder. But because the Court finds that Plaintiff has put forth no evidence that Defendant discriminated against Plaintiff because of his dis-

ability or that the Defendant's decision to terminate Plaintiff was based solely on Plaintiff's disability, no fact issue has been raised and summary judgment is proper. (See *Chevron Corp. v. Redmon*, 745 S.W.2d 314 (Tex.1987)).

9. See Oral Deposition of Larry McIntyre, dated November 22, 1993, pp. 87–88.

letter signed by Barbara Polk, CSW–ACP, dated January 28, 1990, recommending a transfer from grocery manager to retail clerk for Plaintiff as evidence that Defendant knew he was disabled. The Court does not agree that this information constitutes evidence that Defendant was aware of Plaintiff's condition. No reason was given by Plaintiff for his requested leave, other than "health disorder." Specifics of this "disorder" were never given to Defendant:

> Q. And did you explain to anyone at The Kroger Co. what was meant by health disorder?
>
> A. No.[10]

Nor was any reason given by Dr. Polk for the transfer request. The letter is typed on letterhead bearing the name "Timberlawn Psychiatric Hospital" and under Ms. Polk's typewritten name is typed: "Outpatient Services[,] Timberlawn Psychiatric Hospital." From this letter, Plaintiff attempts to convince the Court that Defendant had knowledge that he was suffering from depression. The Court finds that as a matter of law, neither this letter nor Plaintiff's requested leave of absence constitutes evidence of Defendant's knowledge of Plaintiff's alleged disability. Nowhere does the letter state that Plaintiff is suffering from depression. Plaintiff could have sought the medical services of Ms. Polk for any number of reasons, only one of which might have been depression. For example, Plaintiff could have sought treatment for alcoholism or drug addiction, neither of which is considered a disability under the TCHRA.[11]

It is true, as Plaintiff asserts in his response to Defendant's Motion for Summary Judgment that an employer does not need to be aware of the exact diagnosis and full nature of a person's disability in order for that employer to be charged with discrimination in violation of the TCHRA. But the TCHRA at least requires that evidence be shown by Plaintiff that points to some knowledge by Defendant that Plaintiff suffered from a disability in order to charge Defendant with discriminating against Plaintiff *because of* that disability. Plaintiff has failed to point to any such evidence.

Defendant introduced evidence which is not rebutted by Plaintiff, documenting specific reasons for Plaintiff's termination, none of which evidence discriminatory motive behind Defendant's decision. Even if Plaintiff's poor performance, as documented in his constructive advice records, was caused by his alleged disability[12], no evidence exists that Defendant had knowledge of this condition. Accordingly, there is no evidence at all that Defendant acted to terminate Plaintiff solely in response to Plaintiff's alleged disability. As a matter of law then, Defendant's decision to terminate Plaintiff does not constitute the type of discriminatory act against which the TCHRA was designed to protect.

### Conclusion

Plaintiff has failed to meet his burden of establishing the three elements required in order to make out a claim that he was discriminated against because of a disability under the TCHRA. Accordingly, it is **ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED**.

---

**10.** See Oral Deposition of Peter McIntyre, dated November 22, 1993, p. 80.

**11.** See TCHRA § 2.01(4)(b), supra.

**12.** Indeed, uncontroverted evidence was presented by Defendant suggesting that Plaintiff's poor performance was a result of his personality conflict with Mr. Benavidez:

> Q. Had Ms. Abbot continued to be your Store Manager and you had not left [store] 450, do you think you could have continued to perform the duties of a Grocery Manager?
>
> A. Yes. (Deposition testimony of Peter McIntyre, p. 41)

and:

> Q. Okay. Is there anything you liked about Mr. Benavidez?
>
> A. No.
>
> Q. He had no redeeming feature whatsoever as a manager?
>
> A. No. (Deposition testimony of Peter McIntyre, p. 117)