Carol M. HUMPHREYS, Plaintiff,

v.

MEDICAL TOWERS, LTD., Diva Corporation, and David A. Lawson, Defendants.

Civ. A. No. H–94–1226.

United States District Court, S.D. Texas.

June 30, 1995.

Penney P. Bell, Houston, TX, for plaintiff.

Bobbie G. Bayless, Bayless & Stokes, Houston, TX, for defendants.

## MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

Pending before the court is Defendants Medical Towers, Ltd. (MTL), Diva Corporation ("Diva"), and David A. Lawson's ("Lawson") Motion for Summary Judgment (# 45). MTL, Diva, and Lawson seek summary judgment on Humphreys' claims of intentional infliction of emotional distress, hostile environment and *quid pro quo* sexual harassment, sex discrimination, retaliation, constructive discharge, and violations of the Texas Commission on Human Rights Act ("TCHRA"). Defendants also contend that Lawson cannot be held personally liable in this action and dispute certain elements of damages claimed by Humphreys.

Having reviewed the motion, the submissions of the parties, the pleadings, and the applicable law, this court is of the opinion that the defendants' motion for summary judgment should be granted in part and denied in part.

### I. *Background.*

On April 1, 1988, Humphreys was hired by MTL, a limited partnership which owns the Medical Towers Building located at 1709 Dryden in Houston, Texas. Humphreys was originally employed as an administrative assistant to Lawson, who was her supervisor. Lawson is the president and sole shareholder of Diva, which, in turn, is the general and managing partner of MTL. Lawson is also a limited partner of MTL. Diva has a contract to provide management services for MTL. Humphreys was promoted to bookkeeper and later, in the Spring of 1989, to building manager. Humphreys' responsibilities as building manager included administration of the office, tenant relations, and overseeing the bookkeeping.

In November 1989, there was an altercation between Humphreys and Roger Bailey ("Bailey"), the chief engineer for the Medical Towers Building, over a maintenance matter. According to Humphreys, Bailey called her a "bitch" and a "whore" and threw a paperweight at her. Humphreys asserts that after this incident, Bailey repeatedly exhibited abusive behavior towards her throughout the course of her employment. She also contends that Bailey, ostensibly her subordinate, refused to take directions from her and did not allow employees working under him to communicate with her directly.

In April 1993, Lawson hired a personal friend, Drew Crispin ("Crispin"), to work on a safety project and to serve as a buffer between Humphreys and Bailey, who were not on speaking terms. According to Humphreys, Crispin started assuming some of her duties and ultimately functioned as the *de facto* building manager. When Humphreys was no longer employed at MTL, Crispin officially replaced Humphreys as building manager.

On August 27, 1993, when Bailey called a tenant's employee who had answered the telephone in the management office a "bitch," mistakenly believing her to be Humphreys, Humphreys and Lawson disagreed over Humphreys' handling of the situation. Humphreys' employment at MTL ended on August 30, 1993, when she left the building after arguing with Lawson.

Humphreys filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on September 24, 1993, alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), including sexual harassment, sex discrimination, and retaliation. After the EEOC issued Humphreys a right to sue letter, she initiated this action on April 12, 1994. On May 15, 1995, MTL, Diva, and Lawson filed the instant motion for summary judgment on all of Humphreys' claims.

## II. *Analysis.*

### A. *The Applicable Standard.*

Rule 56(c) provides that "[summary] judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Williams v. Adams,* 836 F.2d 958, 960 (5th Cir.1988). Once a proper motion has been made, the non-moving party may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing the existence of a genuine issue for trial. *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Anderson,* 477 U.S. at 257, 106 S.Ct. at 2514–15; *Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to her case on which she bears the burden of proof at trial. *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. at 2552.

### B. *Intentional Infliction of Emotional Distress.*

■ To prevail on her claim of intentional infliction of emotional distress, Humphreys must establish:

(1) the defendant acted intentionally or recklessly;

(2) the defendant's conduct was extreme and outrageous;

(3) the defendant's actions caused her emotional distress; and

(4) the emotional distress suffered by her was severe.

*MacArthur v. University of Tex. Health Ctr.,* 45 F.3d 890, 898 (5th Cir.1995); *McKethan v.*

*Texas Farm Bureau,* 996 F.2d 734, 742 (5th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 694, 126 L.Ed.2d 661 (1994); *Ugalde v. W.A. McKenzie Asphalt Co.,* 990 F.2d 239, 243 (5th Cir.1993); *Ramirez v. Allright Parking El Paso, Inc.,* 970 F.2d 1372, 1375 (5th Cir.1992); *Johnson v. Merrell Dow Pharmaceuticals, Inc.,* 965 F.2d 31, 33 (5th Cir.1992); *Dean v. Ford Motor Credit Co.,* 885 F.2d 300, 306 (5th Cir.1989); *Wornick Co. v. Casas,* 856 S.W.2d 732, 734 (Tex.1993).

■■■ While "extreme and outrageous," as used in the second element of this standard, is an amorphous phrase that escapes precise definition, there appears to be a consensus that conduct is "outrageous" if it is "atrocious" and surpasses "all possible bounds of decency," such that it is "utterly intolerable in a civilized community." *See MacArthur,* 45 F.3d at 898; *Ugalde,* 990 F.2d at 243; *Johnson,* 965 F.2d at 33; *Dean,* 885 F.2d at 306; *Wornick,* 856 S.W.2d at 734. In *Dean,* the Fifth Circuit (citing Restatement (Second) of Torts § 46, comment d (1965)) stated:

> Liability [for outrageous conduct] has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.... Generally, the case is one in which a recitation of the facts to an average member of the community would lead him to exclaim, "Outrageous."

885 F.2d at 306. Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. *Ugalde,* 990 F.2d at 243; *Johnson,* 965 F.2d at 33; *Wilson v. Monarch Paper Co.,* 939 F.2d 1138, 1143 (5th Cir.1991). There is no occasion for the law to intervene in every case where someone's feelings are hurt. *Id.*

■■■ Specifically, in the employment context, the Fifth Circuit, applying Texas law, has repeatedly stated that a claim for intentional infliction of emotional distress will not lie for "mere employment disputes." *MacArthur,* 45 F.3d at 898; *Johnson,* 965 F.2d at 33. The courts recognize that in order to manage its business properly, an employer must be able to supervise, review, criticize, demote, transfer, and discipline employees. *Id.* at 34; *Wilson,* 939 F.2d at 1143. Even conduct which may be illegal in an employment setting may not be the sort of behavior that constitutes "extreme and outrageous" conduct. *Ugalde,* 990 F.2d at 243.

In her first amended original complaint, Humphreys alleges that the defendants' conduct "constitutes intentional infliction of emotional distress in view of the frequency and duration of the discriminatory conduct, its severity and offensiveness, including the physical intimidation and public humiliation, its interference with [her] ability to perform her job, and its devastating effect on [her] psychological well being and physical health." Humphreys acknowledges that her claim for intentional infliction of emotional distress is based on the same allegations as those underlying her claims of sexual harassment, sex discrimination, and retaliation.

Humphreys' first allegation of misconduct is the "paperweight" incident involving Bailey. Humphreys states that on November 20, 1989, several months after she had been promoted to building manager, she was notified of a water leak on one floors in the Medical Towers Building. Humphreys spoke with Scott Medve ("Medve"), stationary engineer, concerning this matter because Bailey was not in the building. Humphreys asserts that Medve told her the leak was the result of the building engineers not having sufficient time to perform certain maintenance. Humphreys wrote a memorandum to Bailey stating that he needed to keep up with maintenance. According to Humphreys, after Bailey received the memorandum, he "stormed in and called [her] a bitch and a whore and shot the finger at [her] and told [her] to get a real job." Humphreys further contends that Bailey physically assaulted her by gathering all the items off the top of the desk, including a metal paperweight, and throwing them at her face. Humphreys called the police, but at Lawson's request, no charges were ever filed against Bailey. Humphreys claims that Lawson told her that she was overreacting, criticized her for calling the police, and directed her not to put anything in writing about the incident.

The statute of limitations for a cause of action based on the tort of intentional infliction of emotional distress under Texas law is two years. Tex.Civ.Prac. & Rem.Code § 16.003(a); *Polly v. Houston Lighting & Power Co.*, 803 F.Supp. 1, 7 (S.D.Tex.1992), *adopted in part*, 825 F.Supp. 135 (S.D.Tex. 1993); *Garcia v. Webb County Dist. Attorney*, 764 F.Supp. 457, 459 (S.D.Tex.1991). Therefore, only those incidents which occurred after April 12, 1992, within the two years prior to her filing of this lawsuit on April 12, 1994, are actionable under this theory. Because the "paperweight incident" occurred on November 20, 1989, over four years prior to the institution of this suit, Humphreys' claim of intentional infliction of emotional distress based on this incident is time-barred.

Most of Humphreys' remaining claims are general allegations of rude and disdainful treatment by Bailey. Generally, Humphreys claims, without stating any specific dates, that:

> Bailey would not take instructions from her; that Bailey told his engineers not to report to her directly; that Bailey called her a "bitch" both to her face and behind her back; that Bailey told her she was incompetent and should quit, that she was only a secretary, and that she was promoted to building manager because she was cheaper;

> When passing Humphreys in the hallway, Bailey would murmur "You fucking bitch" in a threatening voice;

> He further undermined her authority as building manager by telling contractors that they should deal with him directly because she was incompetent and had no power.

Also without stating dates, Humphreys raises other specific allegations that:

> Bailey implied to a contract crew on the Sabarro project that she was having an affair with a construction supervisor;

> Bailey engaged in petty harassment by putting magazines advertising sexual aids in the reception area during her baby shower;

> During meetings with the contractors and architect for the life safety occupancy code

contract work, he treated her with "blatant hostility."

In addition, Humphreys makes several claims alleging dates of occurrence within the two-year statute of limitations period:

> March 1993—Humphreys had instructed Bailey to put awning cleaning on his schedule, but he failed to do so. When Humphreys inquired into the matter, Bailey said "Bitch, don't tell me what to do. Why don't you get a job you can handle?";

> April 1993—At a meeting at Lawson's house to discuss Humphreys' and Bailey's working relationship, Bailey became angry when Lawson stated that Humphreys was the best property manager he had ever had and left the meeting saying that Humphreys was incompetent and should be fired;

> April 1993—Lawson purportedly hired Crispin to work on the life safety occupancy code and to be a buffer between Humphreys and Bailey. Humphreys claims that Crispin was actually a *de facto* building manager. Lawson instructed Humphreys to teach Crispin about every aspect of her job. Crispin sent out memoranda and gave employees instructions without her knowledge. Lawson and Crispin were critical of and hostile towards Humphreys. Crispin told Humphreys that he was superior to her in every way. Crispin told her that the course for asbestos certification was too technical for her and that he should be the one to attend the training;

> July 1993—When Dana Uncapher ("Uncapher"), a secretary for MTL, wrote Humphreys a memorandum describing Bailey's threatening conduct, Lawson accused Humphreys of instigating the letter;

> August 27, 1993—Bailey had been trying to call Uncapher in the management office, but she did not want to talk to him and hung up. When Bailey called back, a tenant's employee, who was in the office, answered the telephone. Bailey mistakenly thought Humphreys had answered and called the other employee a "bitch";

> August 30, 1993—Lawson criticized Humphreys for the way she handled the August 27 telephone incident because she wrote a

letter of apology to the tenant that included an explanation of MTL's management problems. Humphreys claims that Lawson terminated her employment.

Humphreys alleges that as a result of the actions by Bailey, Lawson, and Crispin, she suffered severe emotional distress. In her affidavit, Humphreys claims that she

> was overwhelmed with feelings of helplessness, sadness, and despair. I lost many nights' sleep worrying about how much longer it would go on, whether Roger would physically attack me, or whether I was going to lose my job. Between midnight and three in the morning I would see reenactments of events of hostility experienced at work and feel all the apprehension and agony again. I would have anxiety-type dreams and wake up in fear and anxiety.

Humphreys further claims that she suffered from hyperactive airways while employed at MTL. She also claims to have suffered spasms in her abdomen and a burning stomach, for which she took Maalox, and to have experienced a loss of appetite. According to Humphreys, she sought medical attention from a cardiologist in May 1993 for a "heavy pain in my chest and going down my left side" and saw a professional counselor on July 27 and August 6, 1993, for stress.

While behavior prohibited by Title VII should not go unaddressed, the law does not envision that every claim for sexual harassment or sexual discrimination will also establish intentional infliction of emotional distress. Clearly, the conduct alleged by Humphreys is far less egregious than other actions found not to constitute intentional infliction of emotional distress as a matter of law in a number of situations. *See, e.g., Ramirez,* 970 F.2d at 1376–77; *Johnson,* 965 F.2d at 34; *Guthrie v. Tifco Indus.,* 941 F.2d 374, 379 (5th Cir.1991), *cert. denied,* 503 U.S. 908, 112 S.Ct. 1267, 117 L.Ed.2d 495 (1992); *Clayton v. Nabisco Brands, Inc.,* 804 F.Supp. 882, 888 (S.D.Tex.1992); *Horton v. Montgomery Ward & Co.,* 827 S.W.2d 361, 369 (Tex.App.—San Antonio 1992, writ denied). The derogatory remarks at issue here are insufficient to satisfy the standard set forth by the Restatement (Second) of Torts § 46,

comment d (1965), as adopted by Texas state and federal courts. Most of the statements attributed to Bailey and Lawson are analogous to "mere insults, indignities, threats, annoyances, or petty oppressions," to which liability does not attach. *See Ugalde,* 990 F.2d at 243. Only in the most unusual of cases does the conduct move out of the "realm of an ordinary employment dispute," into the classification of "extreme and outrageous," as required for the tort of intentional infliction of emotional distress. *Prunty v. Arkansas Freightways, Inc.,* 16 F.3d 649, 654 (5th Cir.1994) (quoting *Dean,* 885 F.2d at 307).

While the "paperweight" incident, if proven, might approach the level of conduct required for a finding of intentional infliction of emotional distress, it is barred by the two-year statute of limitations. The other alleged conduct of Bailey, Lawson, and Crispin, whether time-barred or not, while perhaps offensive and disrespectful, is not so vile or reprehensible to be regarded as being beyond "all possible bounds of decency" or "utterly intolerable in a civilized community." *See MacArthur,* 45 F.3d at 898; *Clayton,* 804 F.Supp. at 888; *Wornick,* 856 S.W.2d at 734.

■ Moreover, Humphreys has not shown that any emotional distress that she may have suffered is "so severe that no reasonable [person] could be expected to endure it." *K.B. v. N.B.,* 811 S.W.2d 634, 640 (Tex. App.—San Antonio 1991, writ denied), *cert. denied,* 504 U.S. 918, 112 S.Ct. 1963, 118 L.Ed.2d 564 (1992); *Benavides v. Moore,* 848 S.W.2d 190, 195 (Tex.App.—Corpus Christi 1993, writ denied). She does not contend that she has experienced any severe psychiatric problems, like those encountered by the plaintiff in *Johnson,* stemming from the defendants' actions. *See Johnson,* 965 F.2d at 33. Humphreys certainly does not claim to have suffered from anything approaching the possibly suicidal, reactive depression experienced by the plaintiff in *Wilson. See Wilson,* 939 F.2d at 1141.

Thus, Humphreys has failed to adduce specific facts sufficient to support the elements of extreme and outrageous conduct and severe emotional distress, two of the required elements of an intentional infliction of emo-

tional distress cause of action under Texas law. Accordingly, Humphreys' intentional infliction of emotional distress claim must fail.

### C. *Hostile Work Environment Sexual Harassment.*

■ A cause of action for hostile work environment requires the existence of severe or pervasive and unwelcome verbal or physical harassment because of a plaintiff's membership in a protected class. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66–67, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986); *Sischo–Nownejad v. Merced Community College Dist.,* 934 F.2d 1104, 1109 (9th Cir. 1991); *Young v. Will County Dep't of Public Aid,* 882 F.2d 290, 294 (7th Cir.1989); *Jones v. Flagship Int'l,* 793 F.2d 714, 719–20 (5th Cir.1986), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987). Title VII makes it illegal for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e—2(a)(1). Two principal theories of sexual harassment are cognizable under Title VII—hostile work environment and *quid pro quo. See Vinson,* 477 U.S. at 65, 106 S.Ct. at 2404–05. In the instant case, Humphreys asserts that her claim is based on both theories.

■ Hostile work environment sexual harassment occurs when an employer's conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Vinson,* 477 U.S. at 65, 106 S.Ct. at 2404–05. The United States Supreme Court recently affirmed that sexually discriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment that violates Title VII. *Harris v. Forklift Sys., Inc.,* —— U.S. ——, —— ———, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295 (1993) (citing *Vinson,* 477 U.S. at 65, 67, 106 S.Ct. at 2404–05, 2405–06). Whether the sexual conduct complained of is sufficiently pervasive to create a hostile or offensive work environment must be determined from the totality of the circumstances. *Id.* at ——, 114 S.Ct. at 371. In determining whether a work environment is abusive, a court should consider such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* The test is an objective, rather than a subjective, one. *See DeAngelis v. El Paso Mun. Police Officers Ass'n,* 51 F.3d 591, 594 (5th Cir. 1995) (citing *Harris,* —— U.S. at ——, 114 S.Ct. at 370).

■ The Fifth Circuit has set forth five elements necessary to establish a *prima facie* case of sexual harassment in the work place:

(1) the plaintiff belongs to a protected class;

(2) the plaintiff was subject to unwelcome sexual harassment;

(3) the harassment was based on sex;

(4) the harassment affected a term, condition, or privilege of employment; and

(5) the employer either knew or should have known of the harassment and failed to take prompt action.

*DeAngelis,* 51 F.3d at 594; *Nash v. Electrospace Sys., Inc.,* 9 F.3d 401, 403 (5th Cir. 1993); *see Cortes v. Maxus Exploration Co.,* 977 F.2d 195, 198–99 (5th Cir.1992); *Waltman v. International Paper Co.,* 875 F.2d 468, 477 (5th Cir.1989); *Dornhecker v. Malibu Grand Prix Corp.,* 828 F.2d 307, 309 n. 3 (5th Cir.1987); *Jones,* 793 F.2d at 719–20.

Humphreys claims that the defendants discriminated against her by "condoning, ratifying, permitting, and refusing to terminate the sexual harassment" directed against her. While it is undisputed that Humphreys belongs to a protected class because she is a female, the defendants argue that they are entitled to summary judgment on Humphreys' claim of hostile work environment sexual harassment because Humphreys has failed to establish that she was subject to unwelcome sexual harassment, that the harassment was based on sex, or that her conditions of employment were altered.

■ MTL, Diva, and Lawson correctly assert, and Humphreys apparently recognizes, that any claims based on the 1989 "paperweight" incident are time-barred under Title VII. Humphreys did not file an EEOC charge within 300 days after the incident, as required by 42 U.S.C. § 2000e–5(e)(1). Because Humphreys does not attempt to demonstrate facts supporting waiver, estoppel, or equitable tolling, she may not now seek relief under Title VII for this incident. *See Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 398, 102 S.Ct. 1127, 1135, 71 L.Ed.2d 234 (1982); *Merrill v. Southern Methodist Univ.*, 806 F.2d 600, 604 (5th Cir. 1986). Nevertheless, a discriminatory act not made the basis of a timely charge when separately considered may constitute relevant background evidence in this proceeding on the other claims not barred by the 300–day statute of limitations under Title VII. *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977); *Cortes*, 977 F.2d at 199; *Downey v. Southern Natural Gas Co.*, 649 F.2d 302, 305 (5th Cir.1981).

With respect to the second element, defendants assert that Humphreys invited Bailey's actions because the evidence shows that the relationship between Bailey and Humphreys was one in which they both fought with each other. Humphreys, however, has presented, in addition to the above described conduct, deposition testimony from other MTL employees who stated that Humphreys neither made derogatory statements about Bailey nor provoked or invited hostile behavior from Bailey.

■ With respect to the third element, the defendants claim that Humphreys has failed to establish that Bailey's treatment of her was due to her sex because it arose from anger and was not sexual in nature. In order to establish a claim of hostile environment, however, it is not necessary that the offending conduct be explicitly sexual in nature. *See, e.g., Kopp v. Samaritan Health System, Inc.*, 13 F.3d 264, 269 (8th Cir.1993); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1485 (3rd Cir.1990); *Hall v. Gus Const. Co., Inc.*, 842 F.2d 1010, 1014 (8th Cir.1988); *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415 (10th Cir.1987); *Bell v. Crackin Good Bakers, Inc.*, 777 F.2d 1497, 1503 (11th Cir. 1985); *McKinney v. Dole*, 765 F.2d 1129, 1138 (D.C.Cir.1985); *Robinson v. Jacksonville Shipyards, Inc.*, 760 F.Supp. 1486, 1522 (M.D.Fla.1991); *Laughinghouse v. Risser*, 754 F.Supp. 836, 840 (D.Kan.1990). Here, Humphreys has adduced sufficient evidence to raise a fact issue as to whether the abusive treatment she allegedly received was because of her sex.

■ With respect to the fourth element, the defendants claim that Bailey's actions did not alter Humphreys' working conditions or create an abusive environment. A working environment is abusive "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris*, — U.S. at —, 114 S.Ct. at 370 (quoting *Vinson*, 477 U.S. at 65, 67, 106 S.Ct. at 2404–05, 2405–06). In his deposition, Bailey admits that he instructed contractors not to deal with Humphreys. Medve also stated in his deposition that Bailey instructed the engineers not to talk to Humphreys. This kind of interference clearly could have impaired Humphreys' ability to do her job and altered her working conditions as building manager. Furthermore, by Bailey's own admissions he called Humphreys incompetent and a "bitch," which also could have contributed to an abusive environment.

■ With respect to the fifth element, the defendants claim that Humphreys cannot establish that her employer did not take prompt remedial action upon learning of Bailey's conduct. An employer becomes liable for sexual harassment only if it knew or should have known of the harassment and failed to take prompt remedial action. *Garcia v. Elf Atochem N. Am.*, 28 F.3d 446, 451 (5th Cir.1994); *Nash*, 9 F.3d at 404 (citing *Jones*, 793 F.2d at 720). Humphreys can show actual notice by proving that she had previously complained of the perceived harassment to higher management. *Waltman*, 875 F.2d at 478.

In the situation where an employer receives notice of alleged sexual harassment and makes a prompt remedial response to the complaint that is reasonably calculated to end the harassment, the employer is not liable for the sexual harassment, even if the conduct complained of in fact occurred. *See Carmon v. Lubrizol Corp.,* 17 F.3d 791, 794–95 (5th Cir.1994). "'What is appropriate remedial action will necessarily depend on the particular facts of the case—the severity and persistence of the harassment, and the effectiveness of any initial remedial steps.'" *Elf Atochem N. Am.,* 28 F.3d at 451 (quoting *Waltman,* 875 F.2d at 479). Thus, the focus shifts to whether the defendants took prompt remedial action when confronted with Humphreys' complaint.

Lawson contends that he responded to the August 1993 incident, even though there had been no sexual harassment, by suspending Bailey without pay and placing him on probation. This first-time disciplinary action against Bailey was taken only after he had insulted someone other than Humphreys and after Humphreys had already ceased her employment at MTL. Lawson also maintains that he sent Humphreys and Bailey to counselling at MTL's expense to improve relations between them. This action, while perhaps commendable, might remedy a situation in which two people simply do not get along, but it might not be reasonably calculated to end a continuous course of sexual harassment, as alleged by Humphreys. In other instances, under Humphreys' version of the events, Lawson was less than supportive of her position. For example, after learning of the "paperweight" incident, Lawson criticized Humphreys for overreacting and did not reprimand Bailey in any manner. Moreover, according to Humphreys, she tried to talk to Lawson about Bailey's behavior on other occasions, only to have Lawson dismiss her complaints. In addition, Humphreys maintains that Lawson tried to excuse Bailey's behavior by saying that Bailey could not work for and would not take orders from a woman. Thus, a fact issue exists as to whether the defendants failed to take prompt remedial action after receiving actual notice of her complaint of sexual harassment, as required to establish employer liability.

Because there are outstanding issues of material fact, the defendants are not entitled to summary judgment on Humphreys' hostile work environment sexual harassment claim.

### D. *Quid Pro Quo Sexual Harassment.*

A second principal theory of sexual harassment is *quid pro quo.* See *Vinson,* 477 U.S. at 65, 106 S.Ct. at 2404–05. The first five elements for *quid pro quo* sexual harassment are identical to the elements of a *prima facie* case of sexual harassment based on hostile environment. To establish liability for *quid pro quo* harassment, however, the employee's acceptance of the harassment must be an expressed or implied condition of the receipt of a job benefit, or the employee's rejection of the harassment must cause a tangible job detriment. *Ellert v. University of Texas at Dallas,* 52 F.3d 543, 545 (5th Cir.1995); *Collins v. Baptist Memorial Geriatric Ctr.,* 937 F.2d 190, 196 (5th Cir.1991), *cert. denied,* 502 U.S. 1072, 112 S.Ct. 968, 117 L.Ed.2d 133 (1992); *Jones v. Flagship Int'l,* 793 F.2d at 722; *Polly,* 803 F.Supp. at 5. In essence, an employer may not require sexual favors from an employee as a *quid pro quo* for job benefits. *Jones,* 793 F.2d at 721.

Humphreys alleges, in addition to her claim of sexual harassment base on hostile work environment, that the harassment constitutes *quid pro quo* sexual harassment because her continued employment at Medical Towers was a job benefit conditioned on her continued acceptance of Bailey's "sexually hostile treatment." Humphreys, however, fails to allege any specific facts in support of her *quid pro quo* claim other than those alleged in her claim for sexual discrimination or hostile environment. These factual allegations, which do not contain claims of sexual propositions or requests for sexual favors in return for the receipt of a job benefit, are inadequate to raise a fact issue concerning *quid pro quo* sexual harassment. *See Nichols v. Frank,* 42 F.3d 503, 506 (9th Cir.1994); *Karibian v. Columbia Univ.,* 14 F.3d 773, 775–76 (2d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994); *Carrero v. New York City Hous. Auth.,* 890 F.2d

569, 572–73 (2d Cir.1989). Hence, Humphreys' *quid pro quo* sexual harassment claim must be rejected.

### E. Sex Discrimination.

 Under Title VII, it is unlawful to discharge or otherwise discriminate against an individual with respect to terms, conditions, or privileges of employment because of her sex. 42 U.S.C. § 2000e–2(a). In general, a plaintiff can prove sex discrimination in two ways. A plaintiff can prove discriminatory animus by direct evidence or by an indirect or inferential method of proof. *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1216 (5th Cir.1995). In order to establish a *prima facie* case of sex discrimination under the indirect method of proof, the plaintiff must show:

(1) she is a member of a protected group;

(2) she was qualified for the position;

(3) an adverse employment action occurred; and

(4) she was replaced by a person not in the protected group.

*St. Mary's Honor Ctr. v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Alternatively, she may establish a *prima facie* case by showing that she is a member of a protected class, she was qualified for the position, and persons outside the protected class were treated more favorably than she. *Waggoner v. City of Garland*, 987 F.2d 1160, 1163 (5th Cir.1993); *Johnson v. Chapel Hill Indep. Sch. Dist.*, 853 F.2d 375, 381 (5th Cir.1988); *Thornbrough v. Columbus & Greenville R.R. Co.*, 760 F.2d 633, 639 (5th Cir.1985). At all times, the plaintiff has the ultimate burden to prove sex discrimination. *St. Mary's Honor Ctr.*, —— U.S. at ——, 113 S.Ct. at 2747.

 Once the *prima facie* case is established, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *Id.; McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. at 1824. If the employer meets its burden, the *prima facie* case is dissolved and the burden shifts back to the plaintiff to establish that the reason proffered by the employer is merely a pretext for sex discrimination. *Id.; Rhodes v. Guiberson Oil Tools*, 39 F.3d 537, 542 (5th Cir.1994); *Marcantel v. Department of Transp. & Dev.*, 37 F.3d 197, 200 (5th Cir.1994). To demonstrate a "pretext for discrimination," the plaintiff must show both that the employer's proffered reason was false and that sex discrimination was the real reason. *See St. Mary's Honor Ctr.*, —— U.S. at ——, 113 S.Ct. at 2752; *Rhodes*, 39 F.3d at 542.

 If, however, the plaintiff produces direct evidence of discrimination, the *McDonnell Douglas* test is inapplicable. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 621–22, 83 L.Ed.2d 523 (1985); *Mooney*, 54 F.3d at 1216. The mixed-motives theory of discrimination under *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), comes into play when direct evidence of discrimination is presented, but the employer asserts that the same adverse employment decision would have been made regardless of discrimination. *Mooney*, 54 F.3d at 1216. Unlike *McDonnell Douglas*, which simply involves a shifting of the burden of production, *Price Waterhouse* involves a shift of the burden of persuasion to the defendant. *Id.* Hence, under *Price Waterhouse*, once a plaintiff presents direct evidence of discrimination, the burden of proof shifts to the employer to show that the same adverse employment decision would have been made regardless of discriminatory animus. *Id.* If the employer fails to carry this burden, the plaintiff prevails. *Id.*

 Under either methodology, an employee's own subjective belief of sex discrimination, however genuine, cannot be the basis for judicial relief. *Little v. Republic Ref. Co.*, 924 F.2d 93, 96 (5th Cir.1991); *Sherrod v. Sears, Roebuck & Co.*, 785 F.2d 1312, 1316 (5th Cir.1986); *Elliott v. Group Medical & Surgical Servs.*, 714 F.2d 556, 567 (5th Cir.1983), *cert. denied*, 467 U.S. 1215, 104 S.Ct. 2658, 81 L.Ed.2d 364 (1984). Although Title VII protects employees against

sex discrimination in the terms and conditions of employment, it does not afford women special preference or place upon the employer an affirmative duty to accord them special treatment. *See Williams v. General Motors Corp.*, 656 F.2d 120, 129 (5th Cir. 1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982).

▬ In the instant case, Humphreys alleges in her first amended complaint that the defendants discriminated against her on the basis of her sex with respect to the terms and conditions of her employment and by discharging her. Humphreys meets the first *prima facie* element because, as a woman, she is a member of a protected class under Title VII. She also has alleged facts to show that she was qualified for the building management position from which she claims to have been discharged, thus satisfying the second element. Lawson admitted in his deposition that Humphreys was very good in administration and tenant relations. Moreover, Uncapher stated in her deposition that she heard Lawson state at the April 1993 meeting at his house that Humphreys was the best building manager he had ever had.

In support of the third element, Humphreys alleges that Lawson discharged her from MTL when he told her to "get out" during their argument on August 30, 1993. The defendants assert that Humphreys voluntarily left her position at MTL. Deposition testimony of Uncapher establishes that she overheard at least part of the final altercation between Humphreys and Lawson. She stated that Humphreys kept asking Lawson whether he was firing her and he, in turn, kept asking her whether she was quitting, without either ever answering the other. Uncapher further stated that Lawson told Humphreys both to "get out" and "don't walk out." After that, more conversation between Humphreys and Lawson ensued, which Uncapher did not hear, and, then, Humphreys left. Lawson concedes that he had the locks changed immediately after Humphreys was no longer working at MTL. From these facts, it reasonably could be inferred that Humphreys did not leave her job voluntarily. Humphreys also contends that while she was still employed, she was in effect demoted

because Crispin usurped many of her duties and responsibilities and started functioning as the *de facto* building manager. Thus, fact issues exist concerning whether Humphreys was discharged or demoted.

Humphreys has satisfied the fourth *prima facie* element by establishing that Crispin, a male, replaced her as building manager. Humphreys points out that Crispin was not as qualified as she for the position of building manager. She notes that she had four years of building management experience with MTL, maintained her real estate license, attended training sessions and meetings of professional building managers organizations, and was certified as an asbestos removal supervisor. Lawson admitted at deposition that Crispin, with whom he had been friends for several years, did not have a real estate license or any previous experience in property management. He also conceded that he did not know whether Crispin had any experience as a leasing agent.

Therefore, Humphreys has adduced sufficient facts to permit a jury to find a *prima facie* case of sex discrimination. She also has produced some direct evidence of discrimination. The defendants, on the other hand, have not articulated a legitimate nondiscriminatory reason for her alleged discharge or demotion or shown that she would have been discharged or demoted regardless of discrimination; they merely claim that she was not discharged or demoted. Hence, there exist genuine issues of material fact with respect to Humphreys' sex discrimination claim, and summary judgment is not appropriate.

### F. *Retaliation.*

▬ Title VII prohibits employers from retaliating against persons who oppose unlawful employment practices. 42 U.S.C. § 2000e–3(a). Retaliation under Title VII is an action taken against an employee by an employer because of the employee's opposition to discriminatory practices. *De Anda v. St. Joseph Hosp.*, 671 F.2d 850, 852 n. 1 (5th Cir.1982). To establish a *prima facie* case of retaliation in violation of Title VII, a plaintiff must show:

(1) that she engaged in activity protected by Title VII;

(2) that an adverse employment action occurred; and

(3) that there was a causal connection between the participation in the protected activity and the adverse employment decision.

*Jones,* 793 F.2d at 724; *Hamilton v. Rodgers,* 791 F.2d 439, 441–42 (5th Cir.1986). In order to maintain an action for retaliation, an employee need only establish that she had a reasonable belief that such practices existed. *De Anda,* 671 F.2d at 853 n. 2. In addition, the employee must show that her opposition to unlawful activity was the motivating and determinative factor in her termination, *i.e.,* she must demonstrate a causal connection. *Jack v. Texaco Research Ctr.,* 743 F.2d 1129, 1131 (5th Cir.1984); *McMillan v. Rust College, Inc.,* 710 F.2d 1112, 1116 (5th Cir.1983).

■ The defendants assert that there was no retaliation because, according to their version of events, Humphreys voluntarily left her position at MTL. Humphreys, on the other hand, claims that the defendants retaliated against her because of her opposition to what she reasonably believed to be unlawful discrimination. Humphreys contends that she opposed an unlawful activity when she reported Bailey's actions to Lawson and that adverse employment actions occurred thereafter. She alleges that Lawson tolerated Bailey's mistreatment of her, that he hired Crispin, and then he fired her and replaced her with Crispin. She asserts that there is a direct causal connection between her reporting of Bailey's actions to Lawson and Lawson's decisions not to discipline Bailey, to bring Crispin into MTL management, and ultimately to terminate Humphreys. Because Humphreys has adduced evidence sufficient to establish issues of material fact, the defendants are not entitled to summary judgment on Humphreys' retaliation claim.

### G. *Constructive Discharge.*

■ Humphreys alleges, in the alternative, that she was constructively discharged. A constructive discharge occurs when an employer makes an employee's working conditions so intolerable that the employee is forced to resign. *Junior v. Texaco, Inc.,* 688 F.2d 377, 378 (5th Cir.1982); *Young v. Southwestern Sav. & Loan Ass'n,* 509 F.2d 140, 144 (5th Cir.1975). To determine whether a constructive discharge has occurred, the plaintiff's actions must be analyzed from the standpoint of a "reasonable employee." The working conditions must have been "so difficult or unpleasant that [a] reasonable person in [the plaintiff's] shoes would have felt compelled to resign." *McKethan,* 996 F.2d at 741 (citing *Ugalde,* 990 F.2d at 242). The working conditions must be viewed objectively by examining the conditions imposed by MTL, not by viewing Humphreys' state of mind. *Epps v. NCNB Texas,* 7 F.3d 44, 46 (5th Cir.1993) (citing *Jett v. Dallas Indep. Sch. Dist.,* 798 F.2d 748, 755 (5th Cir.1986), *remanded in part on other grounds,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)); *Shawgo v. Spradlin,* 701 F.2d 470, 481 n. 12 (5th Cir.), *cert. denied,* 464 U.S. 965, 104 S.Ct. 404, 78 L.Ed.2d 345 (1983). As the United States Court of Appeals for the Fourth Circuit noted:

> Every job has its frustrations, challenges, and disappointments; these inhere in the nature of work. An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers. He is not, however, guaranteed a working environment free of stress.

*Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied,* 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986). Nevertheless, the employee need not show that the employer imposed intolerable conditions with the specific intent to force the employee to resign. *Jurgens v. EEOC,* 903 F.2d 386, 390 (5th Cir.1990); *Boze v. Branstetter,* 912 F.2d 801, 804 (5th Cir.1990).

■ An employee can prevail on a constructive discharge claim based on an alleged demotion if the working conditions in the new position were so intolerable that a reasonable employee would have resigned. *Id.* at 806. Although demotions may give rise to a constructive discharge, a "slight decrease in pay coupled with some loss of supervisory responsibilities is insufficient to constitute a

constructive discharge." *Jurgens*, 903 F.2d at 391–92. When the humiliation and embarrassment of demotion are not significant, there can be no claim of constructive discharge. *Id.* at 391.

Here, Humphreys claims that the defendants made her working conditions so intolerable that a reasonable person would have felt compelled to resign. Lawson stated in his deposition that when he hired Crispin, he told Humphreys that she would no longer be Bailey's supervisor. Furthermore, according to Humphreys, Crispin started to take over her duties as building manager. Under these circumstances, the alleged demotion, coupled with the purported abusive behavior directed against Humphreys by Bailey and Crispin, raise issues of material fact with regard to Humphreys' claim of constructive discharge.

### H. Liability of Lawson.

#### 1. Lawson's Liability as Humphreys' Supervisor.

Title VII imposes liability upon employers who violate its provisions. "Employer" is defined as "a person engaged in an industry affecting commerce ... and any agent of such a person." 42 U.S.C. § 2000e(b). In construing the term "any agent," courts have found immediate supervisors to be employers under the Act when they have been delegated an employer's traditional rights, such as hiring and firing. *Harvey v. Blake*, 913 F.2d 226, 227 (5th Cir.1990); *Hamilton*, 791 F.2d at 443. Only when the supervisor is acting in an official capacity, however, can he be deemed an "agent" of the employer. *Harvey*, 913 F.2d at 228. Therefore, any recovery against the agent must be in his official, not individual, capacity. *Id.* The purpose of the inclusion of the "agent" provision in § 2000e(b) was to incorporate *respondeat superior* principles into Title VII. *Grant v. Lone Star Co.*, 21 F.3d 649, 652 (5th Cir.1994); *Miller v. Maxwell's Int'l, Inc.*, 991 F.2d 583, 587 (9th Cir. 1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1049, 127 L.Ed.2d 372 (1994). Therefore, finding an individual employee of a private corporation liable in his "official" capacity is tantamount to finding the corporation liable.

Humphreys claims that Lawson is liable because he was acting within the course and scope of his employment as president of Diva and as Humphreys' supervisor. Individual employees, however, even those functioning in a management capacity, cannot be held personally liable under Title VII. *Grant*, 21 F.3d at 652–53. The fact that Lawson controlled the operations of MTL, Humphreys' employer, and is the sole shareholder and president of Diva, the managing and general partner of MTL, is insufficient, standing alone, to impose individual liability upon him under Title VII. *See EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1281 (7th Cir.1995).

#### 2. Lawson's Liability as a Limited Partner of MTL.

Under Texas law, general partners of a limited partnership are personally liable to creditors for the debts of the limited partnership the same as a partner in a general partnership. *Sunbelt Serv. Corp. v. Vandenburg*, 774 S.W.2d 815, 817 (Tex.App.—El Paso 1989, writ denied). The Texas Revised Limited Partnership Act ("TRLPA") further provides that a limited partner is not liable for the obligations of the limited partnership unless the limited partner is also a general partner or participates in the control of the business in addition to exercising rights as a limited partner. TEX.REV.CIV.STAT.ANN. art. 6132a–1, sec. 3.03(a). If the limited partner participates in the control of the business, he is liable only to persons transacting business who reasonably believe that the limited partner is the general partner based on the limited partner's conduct. *Id.* The TRLPA further states, however, that a limited partner does not participate in the control of the business by having or acting in one or more of the following capacities:

(1) acting as a contractor for or an agent or employee of the limited partnership or of a general partner, an officer, director, or stockholder of a corporate general partner, or a partner of a partnership that is a general partner of the limited liability partnership.

Tex.Rev.Civ.Stat.Ann. art. 6132a–1 sec. 3.03(b)(1).

Humphreys asserts that Lawson should be deemed a general partner of MTL because, while employed at MTL, Lawson controlled all aspects of the business and she reasonably believed him to be the general partner of MTL, as he reported to no one when making decisions and had complete control of MTL. Humphreys claims that Lawson never said he was merely a limited partner, nor did she see any documents stating he was a limited partner of MTL. In further support, Humphreys cites to the deposition testimony of Dolly Macasaet ("Macasaet"), bookkeeper of MTL, who stated that Lawson is the general partner of MTL, and to the deposition testimony of Medve, who stated that Lawson owns Medical Towers. Hence, summary judgment is inappropriate because fact issues exist as to whether Lawson conducted himself as a general partner of MTL.

### 3. Lawson's Liability as the President and Sole Shareholder of Diva.

Under Texas law, a corporation is a wholly separate, legal entity, and as such, the corporation, and not its shareholders, is liable for its debts. *Western Horizontal Drilling, Inc. v. Jonnet Energy Corp.*, 11 F.3d 65, 67 (5th Cir.1994). The corporate entity, however, will be disregarded when it "has been used as part of a basically unfair device to achieve an inequitable result." *Castleberry v. Branscum*, 721 S.W.2d 270, 271 (Tex.1986). The alter ego doctrine is one method by which an obligee can pierce the corporate veil to reach the shareholder's assets. *Thrift v. Hubbard*, 44 F.3d 348, 353 (5th Cir.1995). Alter ego liability may be imposed when a corporation is organized and operated as a mere tool or business conduit of another. *Western Horizontal Drilling, Inc.*, 11 F.3d at 68 (citing *Castleberry*, 721 S.W.2d at 272). Alter ego status is shown by:

> the total dealings of the corporation and the individual, including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount

of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes. *Castleberry*, 721 S.W.2d at 272. The rationale of the alter ego doctrine is if the shareholders have disregarded the separateness of the corporate entity, then the law will also disregard it as is necessary to protect creditors. *Gibraltar Sav. v. LDBrinkman Corp.*, 860 F.2d 1275, 1288–89 (5th Cir.1988), *cert. denied*, 490 U.S. 1091, 109 S.Ct. 2432, 104 L.Ed.2d 988 (1989).

In her first amended complaint, Humphreys asserts, in the alternative, that Lawson is liable because Diva, the general partner of MTL, is his alter ego. She claims that because there is such unity between Lawson and Diva, the corporation does not exist, and relieving Lawson of personal liability would result in great injustice. In support of this claim, Humphreys points out that Lawson is the sole shareholder of Diva, a corporation which is severely undercapitalized, derives almost all of its income from the operations of MTL, and pays for a number of Lawson's personal expenses. The defendants, on the other hand, contend that this is insufficient to establish alter ego liability. Humphreys, however, has proffered sufficient evidence to raise a fact issue with respect to Humphreys' contention that Diva is the alter ego of Lawson, precluding summary judgment in favor of Lawson.

### I. Mitigation of Damages.

Upon leaving MTL, Humphreys, like any other claimant, was under a duty to mitigate her damages. *See Ford Motor Co. v. EEOC*, 458 U.S. 219, 231–32, 102 S.Ct. 3057, 3065–66, 73 L.Ed.2d 721 (1982); *Sellers v. Delgado College*, 902 F.2d 1189, 1193 (5th Cir.), *cert. denied*, 498 U.S. 987, 111 S.Ct. 525, 112 L.Ed.2d 536 (1990); *Hansard v. Pepsi–Cola Metro. Bottling Co.*, 865 F.2d 1461, 1468 (5th Cir.), *cert. denied*, 493 U.S. 842, 110 S.Ct. 129, 107 L.Ed.2d 89 (1989). In order to recover back pay, Humphreys was obligated to exercise reasonable diligence in seeking employment substantially equivalent to the position lost. *See Ford Motor Co.*, 458 U.S. at 231–32, 102 S.Ct. at 3065–66; *Sellers*,

902 F.2d at 1196. The claimant, however, need not go into another line of work, accept a demotion, or take a demeaning position. *Ford,* 458 U.S. at 231, 102 S.Ct. at 3065. Substantially equivalent employment is employment which " 'affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status as the position' " which the Title VII plaintiff held. *Floca v. Homcare Health Servs.,* 845 F.2d 108, 111 (5th Cir.1988) (quoting *Ballard v. El Dorado Tire Co.,* 512 F.2d 901, 906 (5th Cir.1975)); *EEOC v. Exxon Shipping Co.,* 745 F.2d 967, 978 (5th Cir. 1984). The employer must show that work of substantially the same nature was available. *Floca,* 845 F.2d at 111–12.

Humphreys is seeking back pay from September 1993 through December 1994. Humphreys claims that she actively sought employment as a property manager upon her departure from MTL on August 30, 1993, until January 1994 and again from August 1994 to November 1994. In the Spring of 1994, she began taking courses towards earning a teaching certificate. As of December 1994, Humphreys concedes that she no longer pursued a position in property management. As the defendants point out and as her school transcript shows, Humphreys returned to school full time in the Fall of 1994.

▮▮▮ The defendants argue that Humphreys failed to mitigate her damages by turning down a job offer and that any award of back pay should not extend beyond the time when she began taking teaching courses. Humphreys turned down a job offer as a real estate sales person, not as a property manager. This position would not necessarily be the substantial equivalent of a position as a building manager, and if not, Humphreys was not required to accept it in order to mitigate her damages. Nevertheless, she is not entitled to back pay for any time period in which she was not actively seeking employment as a property manager or in a substantially equivalent position. Moreover, she is not entitled to back pay during the time she was attending school full time, beginning in the Fall of 1994. *Floca,* 845 F.2d at 112–13; *Miller v. Marsh,* 766 F.2d 490, 492 (11th Cir.1985); *Taylor v. Safe-*

*way Stores, Inc.,* 524 F.2d 263, 267–68 (10th Cir.1975). With respect to the period commencing on August 30, 1993, through August 1994, there are remaining issues of material fact concerning defendants' mitigation defense, thus precluding summary judgment.

### J. *Compensatory and Punitive Damages Under the 1991 Amendment.*

Prior to the 1991 Amendment to the Civil Rights Act of 1964, a Title VII plaintiff could not recover compensatory and punitive damages. Section 102(a) of the 1991 Amendment, however, provides that the complaining party may recover compensatory and punitive damages in an action for intentional discrimination and places certain caps on damages depending upon the size of the employer. 42 U.S.C. § 1981a(a)(1); *Landgraf v. USI Film Prods.,* —— U.S. ——, ——, 114 S.Ct. 1483, 1488, 128 L.Ed.2d 229 (1994). The United States Supreme Court, finding no clear evidence of congressional intent that § 102 should apply to cases arising before its enactment, held that the Amendment is not to be applied retroactively. *Landgraf,* —— U.S. at ——, 114 S.Ct. at 1508. Thus, compensatory and punitive damages are not available for conduct occurring before the effective date of the 1991 Amendment—November 21, 1991. *LaPlante v. United Parcel Serv., Inc.,* 810 F.Supp. 19, 20 (D.Me.1993). Because all of Humphreys' actionable claims post-date November 21, 1991, there is no impediment, aside from the applicable statutory cap of $50,000.00, to Humphreys' recovery of compensatory and punitive damages in this action.

### K. *Lease Commissions.*

Humphreys contends that a part of any award for damages should include unpaid lease commissions. In her affidavit, Humphreys asserts that she and Lawson had a written agreement that she would receive leasing commissions on any space she leased within the Medical Towers Building. She states that Lawson kept the agreement without her ever having received a copy of it. In support of her claim, Humphreys proffers copies of checks issued to her by MTL and signed by Lawson for lease commissions.

Lawson claims, however, that no such written agreement ever existed and contends that he had no arrangement with Humphreys concerning lease commissions.

 In Texas, real estate leasing commission agreements are subject to the Statute of Frauds. *Equitable Life Assurance Soc'y v. Cushman & Wakefield of Tex., Inc.,* 618 F.2d 363, 365 (5th Cir.1980); *Carmack v. Beltway Dev. Co.,* 701 S.W.2d 37, 39 (Tex. App.—Dallas 1985, no writ). Under the Texas Statute of Frauds, an agreement is not enforceable unless it is in writing and signed by the person against whom the agreement is to be enforced. TEX.BUS. & COM.CODE ANN. § 26.01(a). While Humphreys has not produced a copy of this agreement and apparently cannot do so, there is a genuine issue of material fact concerning whether it ever existed, and if so, whether Lawson signed it, as well as the amount of any lease commissions due Humphreys. Therefore, defendants cannot prevail on summary judgment with regard to this issue.

L. *Claims under the TCHRA.*

One of the purposes of the TCHRA is to "provide for the execution of the policies of Title VII." TEX.LAB.CODE ANN. § 21.001; *Thompson v. City of Arlington,* 838 F.Supp. 1137, 1153 (N.D.Tex.1993); *Elstner v. Southwestern Bell Tel. Co.,* 659 F.Supp. 1328, 1345 (S.D.Tex.1987), *aff'd without opinion,* 863 F.2d 881 (5th Cir.1988). Therefore, consistent with the TCHRA's general policy, it is interpreted in a manner consistent with Title VII. *Elstner,* 659 F.Supp. at 1345. Accordingly, this court will construe all claims under the TCHRA consistent with similar claims under Title VII. Therefore, to the extent that summary judgment is appropriate with respect to Humphreys' claims under Title VII, it is also appropriate as to her parallel claims under the TCHRA.

III. *Conclusion.*

The defendants' motion for summary judgment with respect to Humphreys' claims of intentional infliction of emotional distress and *quid pro quo* sexual harassment is GRANTED. Summary judgment is also GRANTED as to Humphreys' claims against Lawson based solely upon his status as her supervisor at MTL. With regard to Humphreys' remaining claims, the defendants' motion for summary judgment is DENIED.

IT IS SO ORDERED.